146 P.3d 1049

Letizia THOMPSON, Plaintiff–Appellant,

v.

KYO–YA COMPANY, LTD.,
dba Sheraton–Maui Hotel,
Defendant–Appellee,

and

John Does 1–10; Jane Does 1–10; Doe
Partnerships 1–10; Doe Non–Profit En-
tities 1–10; and Doe Governmental Enti-
ties 1–10, Defendants.

No. 26040.

Supreme Court of Hawai'i.

Nov. 9, 2006.

As Amended Nov. 20, 2006.

Ian L. Mattoch and Daniel P. Kirley of the Law Offices of Ian L. Mattoch, on the briefs, for the plaintiff-appellant, Letizia Thompson.

Brenda Morris Hoernig of the Law Offices of Dean E. Ochiai, on the briefs, for the defendant-appellee, Kyo–Ya Company, Ltd. dba Sheraton–Maui Hotel.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; and ACOBA, J., concurring separately, with whom DUFFY, J., joins.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant Letizia Thompson appeals from the August 18, 2003 judgment of the circuit court of the second circuit, the Honorable Shackley F. Raffetto presiding, in favor of the defendant-appellee Kyo–Ya Company, Ltd. dba Sheraton–Maui Hotel (hereinafter, "the Sheraton") and against Thompson.

On appeal, Thompson essentially argues that the circuit court erred in concluding that the Hawai'i Recreational Use Statute (HRUS), Hawai'i Revised Statutes (HRS) ch. 520 (1993 & Supp.1997), applied to her presence on the Sheraton's grounds and thereby immunized the hotel from her negligence claims.

For the reasons discussed *infra* in section III, the Appellant's arguments are unavailing. Accordingly, this court affirms the circuit court's judgment.

## I. BACKGROUND

### A. Factual Background

The present matter arose out of an incident occurring on the island of Maui on September 26, 2000, when Thompson, a certified scuba instructor working as an independent contractor for Pacific Dive, a business located in Lahaina, led three students on a nighttime dive near the Sheraton at a location known as Black Rock.[1] Neither she nor her students had any affiliation with the hotel as employees or guests, nor had they any plans to visit the hotel during the evening in question. The group entered the water north of the hotel and dove south around Black Rock, exiting the water on the beach in front of the Sheraton. Upon exiting the water, the group, still fully clad in their scuba equipment but carrying their masks, fins, and snorkels, used the hotel's unlit beach-access path to return to their vehicles, which were parked in a lot on the hotel grounds provided free of charge for members of the public using the beach.

In her answer to interrogatories, Thompson described what occurred next:

> We were walking down the pathway to the parking garage when my foot dropped into a hole in the cement pathway. I fell with

---

1. Inasmuch as the facts surrounding the incident are not disputed, the factual background is drawn from Thompson's sworn answers to interrogatories and her January 4, 2003 deposition.

full scuba gear on and my head hit the concrete. I remember the cracking sound of my skull. After that, I remember being unable to speak or move....

### B. *Procedural Background*

On April 30, 2002, Thompson filed a complaint against the Sheraton and, on May 17, 2002, amended the complaint to allege premises liability negligence claims. On June 30, 2003, the Sheraton filed a motion for summary judgment, asserting that, as Thompson was not on the hotel's property for any commercial purpose pertaining to the hotel, the HRUS immunized it from liability for her claims. In response, on July 21, 2003, Thompson filed a memorandum in opposition, arguing that the HRUS did not apply to her claims because she did not have a recreational purpose for being on the property but rather was on the land for vocational purposes as a scuba-diving instructor. Following a July 30, 2003 hearing, the circuit court granted the Sheraton's motion for summary judgment, issuing the following oral conclusion of law (COL): "The [c]ourt views this as coming under HRS [§] 520–4(b) [2] and finds that because whatever commercial interest there was here ... was related in no way to the landowner ... the statute applies...." On August 6, 2003, the circuit court issued a written order granting the Sheraton's motion and, on August 18, 2003, issued its final judgment in favor of the Sheraton and against Thompson on all claims. On August 21, 2003, Thompson filed a timely notice of appeal with this court.

## II. STANDARDS OF REVIEW

### A. *Conclusions Of Law*

 " 'A COL is not binding upon an appellate court and is freely reviewable for its correctness.' " *AIG Hawaii Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 628, 851 P.2d 321, 326 (1993) (quoting *Amfac, Inc.*

**2.** HRS § 520–4(b) (Supp.1997) provides in relevant part:

> An owner of land who is required or compelled to provide access or parking for such access through or across the owner's property because of state or county land use, zoning, or planning law ... to reach property used for recreation purposes ... shall be afforded the

*v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28 (1992)). This court ordinarily reviews COLs under the right/wrong standard. *In re Estate of Holt,* 75 Haw. 224, 232, 857 P.2d 1355, 1359 (1993). Thus, " '[a] COL that is supported by the trial court's [findings of fact] and that reflects an application of the correct rule of law will not be overturned.' " *Estate of Caraang,* 74 Haw. at 628–29, 851 P.2d at 326 (quoting *Amfac, Inc.,* 74 Haw. at 119, 839 P.2d at 29). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* at 629, 851 P.2d at 326 (quoting *Amfac, Inc.,* 74 Haw. at 119, 839 P.2d at 29) (internal quotation marks omitted).

*State v. Furutani,* 76 Hawai'i 172, [180], 873 P.2d 51, [59] (1994).

*Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004). (Some brackets and internal citations omitted.) (Some bracketed material altered.)

### B. *Interpretation Of Statutes*

 The interpretation of a statute is a question of law reviewable *de novo. State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996).

Furthermore, ... statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

same protection as to such access, including parking for such access, as an owner of land who ... permits any person to use that owner's property for recreational purposes under subsection (a)[, *see infra* section III.A.1.a, setting forth the general immunities granted under the HRUS].

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [(1993)]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray* [*v. Admin. Dir. of the Court*], 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [(1997)] (footnote omitted).

*State v. Koch,* 107 Hawai'i 215, 220, 112 P.3d 69, 74 (2005) (quoting *State v. Kaua,* 102 Hawai'i 1, 7–8, 72 P.3d 473, 479–80 (2003)). Nevertheless, absent an absurd or unjust result, *see State v. Haugen,* 104 Hawai'i 71, 77, 85 P.3d 178, 184 (2004), this court is bound to give effect to the plain meaning of unambiguous statutory language and may only resort to the use of legislative history when interpreting an ambiguous statute. *State v. Valdivia,* 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001).

C. *Summary Judgment*

 [This court] review[s] the circuit court's grant or denial of summary judgment *de novo.* . . .

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be

viewed in the light most favorable to the non-moving party. In other words, [this court] must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

[*Hawai'i Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)] (citations and internal quotation marks omitted).

*Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)) (internal citation omitted) (some brackets in original).

### III. *DISCUSSION*

On appeal, Thompson asserts that the circuit court: (1) erred by implicitly concluding that, under *Crichfield v. Grand Wailea,* 93 Hawai'i 477, 6 P.3d 349 (2000), absent evidence of a commercial purpose related to the landowner for entering the hotel's property, any presence by Thompson on the property was presumptively recreational; and, hence, (2) erred in concluding that the HRUS immunized the Sheraton from Thompson's negligence claims. She contends that, under *Crichfield,* the determining factor as to whether an entrant is engaged in a "recreational use" and, hence, barred by the HRUS from pursuing negligence claims against the landowner is the subjective intent of the entrant, not the intent of the owner in holding open the land for public use. She maintains that, inasmuch as her purpose at the Sheraton that evening was "occupational or vocational" as a paid diving instructor, she was not a recreational user under the HRUS.

The Sheraton argues that, inasmuch as Thompson concedes that she had no commercial purpose with the hotel, and that, under the plain language of HRS ch. 520, she was engaged in a recreational activity—regardless of her motivation for doing so—, her presence falls under the HRUS.[3]

---

3. Thompson was injured on the beach access path as she and her students returned to their cars. She was, therefore, not, strictly speaking, engaged in the recreational activity of diving when she was injured. Nevertheless, the Sheraton was required to provide beach access and free parking as part of the requirements for obtaining its state and county building and use permits. Pursuant to HRS § 520–4(b), *see supra* note 2, therefore, the fact that Thompson was injured on the path and not while actually diving or using the Sheraton's beach property is imma-

## A. *The HRUS*

### 1. *Ambiguity in the meaning of "recreational user" and "recreational purpose": The plain language of the HRUS and cases construing it*

It is undisputed that Thompson's injury occurred on the Sheraton's land, and nowhere does Thompson argue that her *students* were not engaged in a recreational activity. The crux of the matter, therefore, is whether Thompson was on the Sheraton's property as a "recreational user" for "recreational purposes" under the HRUS when she was engaged in a traditionally recreational activity [4] but with the subjective intent of doing so for vocational or occupational reasons.

As with any statutory inquiry, we begin by analyzing the plain language of HRS ch. 520.

#### a. *The language of HRS ch. 520*

HRS § 520–1 (1993) states that "[t]he purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." To achieve that goal, HRS § 520–3 (Supp.1997) limits the duty of care owed by a landowner to members of the public entering the land for recreational purposes:

> Except as specifically recognized by or provided in [HRS §] 520–6[ (1993) (relating to duties of persons entering the property) ],[5] an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condi-

tion, use, structure, or activity on such premises to persons entering for such purposes. . . .

Furthermore, HRS § 520–4(a) (Supp.1997) limits the liability of an owner to any recreational entrant:

> Except as specifically recognized by or provided in [HRS §] 520–6, [*see supra* note 5,] an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not:
>
> (1) Extend any assurance that the premises are safe for any purpose;
>
> (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;
>
> (3) Assume responsibility for, or incur liability for, any injury to person or property caused by an act of omission or commission of such persons; and
>
> (4) Assume responsibility for, or incur liability for, any injury to person or persons who enter the premises in response to an injured recreational user.[6]

Finally, by its plain language, HRS § 520–4(b), *see supra* note 2, extends the liability limitations set forth in HRS § 520–4(a) to any public access or parking area an owner is compelled by state or county officials to provide for recreational entrants. Nevertheless, while HRS § 520–4(b) establishes that the protections of HRS § 520–4(a) apply equally to public access areas such as the pathway in the present matter, it does not elaborate on

---

terial in analyzing whether the HRUS defenses are available to her.

**4.** Thompson concedes that "scuba diving can be recreational and is similar to other 'recreational' activities listed [in HRS § 520–2], e.g., fishing, swimming and water skiing."

**5.** HRS § 520–6 in fact emphasizes the duty of the *entrant:*
Nothing in this chapter shall be construed to:
(1) Create a duty of care or ground of liability for injury to persons or property.
(2) Relieve any person using the land of another for recreational purposes from any obligation which the person may have in the absence of this chapter to exercise care in

the person's use of such land and in the person's activities thereon, or from the legal consequences of failure to employ such care.

**6.** HRUS allows for only three exceptions to the limitations to landowner duty and liability set forth in HRS §§ 520–3 and 520–4:(1) willful or malicious failures to warn by the landowner; (2) entrance to the land being premised on payment of a fee; and (3) any claim involving a houseguest of the owner as plaintiff. *See* HRS § 520–5 (1993). Thompson concedes that none of the three exceptions apply in the present matter. As noted *supra*, the Sheraton provides public parking for beachgoers free of charge.

the *nature* or *scope* of the protections afforded by HRS § 520–4(a).

In *Crichfield*, this court summarized the overall effect of the HRUS on land owner liability:

> [The] HRUS confers upon the owner of the land immunity from negligence liability to any person—who is neither charged for the right to be present nor a houseguest[, *see supra* note 6]—injured on the land while that person is using the owner's land for a recreational purpose. In other words, if a person is injured on an owner's land, but that person was not on the land for a recreational purpose, [the] HRUS does not, by its plain language, immunize the owner from tort liability.

93 Hawai'i at 485, 6 P.3d at 357. (Internal quotations omitted.) In most suits where a HRUS defense has been invoked, the question whether a party is a recreational user has been outcome-dispositive. *See, e.g., Howard v. United States*, 181 F.3d 1064 (9th Cir.1999); *Palmer v. United States*, 945 F.2d 1134 (9th Cir.1991); *Brown v. United States*, 180 F.Supp.2d 1132 (D.Haw.2001).

Resorting to the plain language of HRS ch. 520 for a definition of recreational user is of limited value. HRS § 520–2 (Supp.1997) defines "recreational user" to mean "any person who is on or about the premises that the owner of the land . . . indirectly . . . permits, without charge, entry onto the property for recreational purposes." "Recreational purpose," in turn, is defined as including "but not limited to any of the following[:] . . . fishing, swimming, boating, . . . and viewing or enjoying . . . scenic or scientific sites." HRS § 520–2.

As noted, the Sheraton contends that Thompson, as a person using the beach path to return to her car after diving, falls within the plain language of HRS § 520–2 and, hence, that the HRUS operates to bar her negligence claims. The hotel asserts that the mere fact that she engaged in the activity as part of a paid arrangement with her students "does not transform the 'recreational purpose'[ ] to a 'non-recreational' one."

Thompson, on the other hand, insists that, under *Crichfield*, her subjective intent to enter the property for a vocational pursuit, even one unrelated to the landowner, is sufficient to establish a non-recreational use of the land. Thompson's argument is unavailing.

#### b. *Crichfield*

This court concluded in *Crichfield* that neither the subjective intent of the landowner in holding open the property nor the subjective intent of the entrant in visiting the property were necessarily dispositive as to whether the plaintiff was a recreational user for the purposes of the HRUS. 93 Hawai'i at 487–88, 6 P.3d at 359–60 (noting, "as a preliminary matter, that the subjective intent of an owner of land is obviously relevant to whether he or she has directly or indirectly invited or permitted an injured party to use the land without charge for a recreational purpose" but concluding that the entrant's subjective intent is also material) [7] (internal quotations omitted).

In *Crichfield*, the plaintiffs alleged that they had entered the Grand Wailea's grounds both to enjoy the gardens and for the commercial purpose of having lunch at one of the hotel's restaurants. 93 Hawai'i at 481, 6 P.3d at 353. This court concluded that the commercial purpose of having lunch at the hotel was a non-recreational use of the property and, in vacating the grant of summary judgment in favor of the hotel, weighed the intent of the landowner and the intent of the entrant and concluded that the plaintiffs' allegations of a commercial purpose with the hotel raised a genuine issue of material fact. 93 Hawai'i at 487–88, 6 P.3d at 359–60. The result in *Crichfield* was based on the legislative history underlying HRS ch. 520 that expressly stated that the HRUS would not affect landowners' common law liability toward business invitees of the landowner, 93

---

7. In concluding that both the subjective intent of the landowner *and* of the entrant were material in determining whether an entrant qualifies as a recreational user, this court concluded that the United States Court of Appeals for the Ninth Circuit had misconstrued the HRUS in *Howard*, 181 F.3d at 1073 (concluding that the plaintiff's subjective intent for being on the land was immaterial in the analysis). 93 Hawai'i at 486–87, 6 P.3d at 358–59.

Hawai'i at 488, 6 P.3d at 360 (quoting Sen. Stand. Comm. Rep. No. 534, in 1969 Senate Journal, at 1075), and a recognized need to prevent commercial establishments from exploiting the HRUS to escape well-settled landowner duties to non-recreational entrants, 93 Hawai'i at 489, 6 P.3d at 361.

### c. *Palmer and Brown*

Research reveals only two other cases that have construed the terms "recreational purpose" and "recreational user" as set out in the HRUS. In *Palmer,* 945 F.2d 1134, decided before *Crichfield,* the United States Court of Appeals for the Ninth Circuit affirmed a decision of the district court holding that the HRUS shielded a military recreational facility from negligence liability claims asserted by a grandfather who slipped and fell at a swimming pool while watching over his granddaughters. *Id.* at 1135. Palmer was only allowed access to the pool area to watch his granddaughters as a favor to his stepdaughter and was not himself allowed in the pool, which was restricted to military personnel and their dependents. *Id.* at 1136–37. Palmer argued that, because he was denied access to the pool, he was not a recreational entrant and, hence, the HRUS did not shield the facility from his claims. *Id.* at 1136. The court first considered the intent of the landowner, concluding that, because "[t]he United States has chosen to make the pool ... available for recreational use free of charge ... [, therefore,] the HRUS is applicable to the pool under the plain, unambiguous language of the statute." *Id.* Addressing next Palmer's contentions that, because his subjective intent in being at the pool was allegedly as a pseudo-lifeguard and therefore not recreational, the court reasoned:

> Even assuming that watching over one's own grandchildren is not a recreational activity, Palmer's services conferred no benefit upon the [recreational facility]. He was not there for the [facilities]' purposes, but rather to facilitate his grandchildren's authorized use of the pool.... He was allowed on the property for his granddaughters' recreational purposes, which is the type of permissive use the HRUS seeks to encourage. Moreover, Palmer's behavior was consistent with relaxation and recreation.... We therefore conclude that he was engaged in a recreational activity for purposes of the HRUS. By affording immunity in this situation, the purpose of the HRUS to encourage landowners to make their recreational property available for use is served.

*Id.* at 1136–37. The *Palmer* court, therefore, considered the intent of the landowner in holding the land open for use, the subjective intent of the entrant, as well as the nature of the entrant's activity while on the property and whether the activity conferred any benefit upon the landowner such that it would be equitable to impose a corresponding duty of care upon the landowner.

The United States District Court for the District of Hawai'i, in *Brown,* focused primarily on the subjective intent of the entrant. The court concluded that a genuine issue of material fact existed as to whether the plaintiff was on a bicycle path on military land for recreational or non-recreational purposes, given the evidence that he was commuting to work[8] on the day he swerved to avoid a runner and suffered injuries. 180 F.Supp.2d at 1140. The *Brown* court concluded that "[t]he *Howard* and *Crichfield* courts agree that the 'subjective intent of an owner of land is obviously relevant to whether he or she has directly or indirectly invited or permitted' a person to use the land for recreational purposes," but nevertheless interpreted *Crichfield* to mean that testimony by the plaintiff that entry was for a non-recreational purpose was sufficient in itself to avoid summary judgment on a HRUS defense. 180 F.Supp.2d at 1139–40 (some internal quotation marks omitted) (quoting *Crichfield,* 93 Hawai'i at 487, 6 P.3d at 359) (citing *Howard,* 181 F.3d at 1072–73).

In *Crichfield,* this court noted that the "HRUS is ambiguous ... regarding the standpoint or perspective from which 'recreational purpose' is ascertained." 93 Hawai'i at 487, 6 P.3d at 359. *Palmer, Howard, Crichfield,* and *Brown* struggled to define

---

**8.** It was uncontested that the bicycle Brown was riding that day was specially equipped for commuting, with mirrors, lights, bags, and rainguards. 180 F.Supp.2d at 1134.

"recreational purpose" and "recreational user" under the HRUS, but there remains indistinctiveness and uncertainty surrounding the terms. An ambiguity exists in the present matter as to whether an activity that (1) is unrelated to the owner of the land and (2) generally falls within the definition of a recreational activity as set forth in HRS § 520-2, *see supra* section III.A. 1.a, can be transformed from a recreational use into a non-recreational one solely by virtue of the plaintiff's subjective reasons for engaging in the activity. Inasmuch as an ambiguity exists, this court may examine the legislative history for guidance. *Koch*, 107 Hawai'i at 220, 112 P.3d at 74.

> 2. *The legislature granted landowners reduced liability exposure to encourage opening private lands to the public for exercise, sightseeing, and access to Hawaii's scenic beauty.*

In 1969, the Senate Committee on Lands and Natural Resources, in reporting on Senate Bill 56, the origins of the HRUS, stated that "[t]he purpose of this bill is to limit the liability of landowners who permit persons to use their property for recreational purposes without charge." Sen. Stand. Comm. Rep. No. 534, in 1969 Senate Journal, at 1075. The House Committee on the Judiciary expressed similar sentiments. *See* Hse. Stand. Comm. Rep. No. 760, in 1969 House Journal, at 914. The Senate committee, however, also noted that it had "amended this bill by deleting section 6 which provide[d] that an owner who provides a public right-of-way through his land to beach areas shall maintain such right-of-way, because it creates an undue burden on landowners." Sen. Stand. Comm. Rep. No. 534, in 1969 Senate Journal, at 1075. The legislature in 1996 further limited the duties of the owners of properties like the Sheraton that maintain beach right-of-ways. Effective June 12, 1996, the legislature amended HRS § 520-4 by adding subsection (b), *see supra* note 2, to ensure that properties required to provide public access paths to recreational areas would benefit from the same protections afforded owners of the actual recreational lands themselves.

In *Crichfield*, this court summarized the legislature's intent in enacting and, in 1996, amending the HRUS:

> Thus, the legislature enacted [the] HRUS to encourage the recreational use of our state's resources by limiting landowners' liability to recreational users and, thereby, promoting the use and enjoyment of Hawaii's resources. Indeed, in amending [the] HRUS in 1996, the legislature reaffirmed its original intent:
>
> > ... The legislature finds that *encouraging the public to engage in recreational activities makes for healthier citizens and allows everyone to enjoy Hawaii's natural resources.* In 1969, *when the legislature enacted chapter 520*, Hawai'i Revised Statutes, *to encourage wider access to lands and waters for hunting, fishing, and other activities, the intent was to make access easier and limit landowners' liability.*

93 Hawai'i at 488–89, 6 P.3d at 360–61 (emphasis in *Crichfield*) (quoting 1996 Haw. Sess. L. Act 151, § 1 at 328). Nevertheless, this court also noted that the "HRUS was not intended ... to have created out of whole cloth a universal defense available to a commercial establishment ... against any and all liability for personal injury" and that the general rule regarding landowner liability to non-recreational entrants remained intact:

> "a possessor of land, who knows or should have known of an unreasonable risk of harm posed to persons using the land, by a condition on the land, owes a duty to persons using the land to take reasonable steps to eliminate the unreasonable risk, or warn the users against it."

93 Hawai'i at 489, 6 P.3d at 361 (quoting *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994)).

This court should, therefore, approach the analysis of whether a HRUS defense is available to the Sheraton in the present matter by seeking an outcome that "encourage[s] the recreational use of our state's resources by limiting landowners' liability to recreational users and, thereby, promot[es] the use and enjoyment of Hawaii's resources" by "encourag[ing] wider access to lands and waters for ... fishing and other activities," while

respecting traditional duties owed by landowners to non-recreational entrants.

B. *Inasmuch As Thompson's Presence On The Land Was "An Action In Pursuit Of The Use Of The Property For Recreation," The Circuit Court Correctly Entered Summary Judgment For The Sheraton.*

Thompson's position would encourage land closures[9] and fails to address the inequities that would result. By her own argument, Thompson directly benefitted economically from the availability of the path, which enabled her to use the Black Rock beach to guide recreational diving groups.[10] Thompson's use of the path that evening as a paid scuba diver would not have occurred were it not for the recreational use of the ocean and the beach by her clients. Yet Thompson would bite the hand that feeds her by stripping the protections of the HRUS from the landowner, contrary to the legislature's intent to encourage landowners to allow entry to individuals wishing to "use . . . the owner's land for recreational purposes—*i.e.*, the recreational enjoyment of the natural resources that are an inextricable part of Hawaii's land and waters." *Crichfield,* 93 Hawai'i at 489, 6 P.3d at 361.

Our research reveals only one case nationally that considers an argument similar to Thompson's, and the court reached a result antithetical to Thompson's position. In *Hafford v. Great N. Nekoosa Corp.,* 687 A.2d 967 (Me.1996), the plaintiff, a recreational outfitter supplying canoeing and camping enthusiasts on the Allagash Waterway in Maine, was injured in an auto accident on a private road owned by Great Northern while transporting his staff to pick up his clients' vehicles. *Id.* at 968. Hafford asserted that the recreational use statute[11] did not apply to him because

**9.** It would also arguably run counter to the legislature's purposes behind enacting HRS § 520–4(b), *see supra* note 2, *i.e.,* extending HRUS immunity to beach paths like the one in question, as well as the legislative intent expressed in Sen. Stand. Comm. Rep. No. 534, in 1969 Senate Journal, at 1075, *see supra* section III.A.2, that requiring "an owner who provides a public right-of-way through his land to beach areas . . . [to] maintain such right-of-way . . . [would] create[] an undue burden on landowners."

**10.** Thompson states in her deposition that, as a responsible instructor, she would not trespass on private land in order to reach the dive site, which is why she used the beach access path.

**11.** In *Hafford* the court based its analysis on Me.Rev.Stat. Ann. tit. 14, § 159–A, a recreational use statute similar to the HRUS, which provided in pertinent part:

1. **Definitions.** As used in this section, unless the context indicates otherwise, the following terms have the following meanings.
. . . .
B. "Recreational . . . activities" means recreational activities conducted out-of-doors, including, but not limited to, hunting, fishing, . . . camping, environmental education and research, hiking, sight-seeing, . . . hang-gliding, . . . equine activities, boating, sailing, canoeing, rafting, biking, picnicking, swimming or activities involving the harvesting or gathering of forest, field or marine products. It includes entry of, volunteer maintenance and improvement of, use of and passage over premises in order to pursue these activities. . . .

. . . .
2. **Limited duty.** An owner . . . or occupant of premises does not have a duty of care to keep the premises safe for entry or use by others for recreational . . . activities or to give warning of any hazardous condition, use, structure or activity on these premises to persons entering for those purposes. . . .
3. **Permissive use.** An owner . . . or occupant who gives permission to another to pursue recreational . . . activities on the premises does not thereby:
A. Extend any assurance that the premises are safe for those purposes;
B. Make the person to whom permission is granted an invitee or licensee to whom a duty of care is owed; or
C. Assume responsibility or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted.
4. **Limitations on section.** This section does not limit the liability that would otherwise exist:
A. For a willful or malicious failure to guard or to warn against a dangerous condition, use, structure or activity;
B. For an injury suffered in any case where permission to pursue any recreational . . . activities was granted for a consideration other than the consideration, if any, paid to the following:
(1) The landowner or the landowner's agent by the State; or
(2) The landowner or the landowner's agent for use of the premises on which the injury was suffered, as long as the premises are not used primarily for commercial recre-

he was on the property for vocational reasons. *Id.* at 969. The Maine Supreme Judicial Court affirmed the lower court's grant of summary judgment in favor of Great Northern, concluding that

> [t]he trial court correctly concluded that Hafford's travel over Great Northern's land was an action in pursuit of the use of the property for recreation even though Hafford was paid by his customers to provide transportation. Hafford was passing over Great Northern's land to facilitate his customer's recreational pursuits; his status as a commercial outfitter does not change the fact that he was using the land for recreational purposes.

*Id.* As the *Hafford* court reasoned, an individual whose purpose for being on the land is unrelated to the owner and is predicated upon the land being available to the public for recreational use at no charge by the landowner due to a recreational use statute is a "recreational user" for the purposes of the statute. The reasoning is sound: without such a rule, entrants who took advantage of open lands to participate in nature walks, scuba dives, or archaeological studies free of charge or benefit to the landowner would be divided into two classes of plaintiffs—the bulk of the entrants would be barred from pursuing negligence claims against the landowner, while a member of the group paid to guide or instruct the others would not—despite the fact that, from the viewpoint of the landowner, the two classes were indistinguishable. Such disparate treatment would be inequitable, particularly inasmuch as the favored individual benefits economically from the opening of the land, and such a policy would, no doubt, discourage landowners from allowing any entrants onto their land for fear that one of them might be earning money from the visit.

Rather, a more just result is reached under the reasoning in *Hafford,* concluding that where the plaintiff's presence on the land is closely associated with the presence of individuals whose purpose on the land is purely recreational, the recreational purpose attaches to the plaintiff. We find the reasoning in *Hafford* persuasive.

In the present case, in which Thompson's presence on the land would not have occurred but for the recreational activity undertaken by her students and in which she derived a direct financial benefit from the policies underlying HRS ch. 520, to allow her to benefit financially while concluding that the landowner is afforded no protection by HRS ch. 520 would be unfair and contrary to the intent of the legislature.

We, therefore, hold that the circuit court correctly concluded that Thompson's status on the Sheraton's property fell as a matter of law within the ambit of HRS ch. 520 as a recreational user, inasmuch as she was engaged in "an activity in pursuit of the use of the property for recreational purposes" and, therefore, that the Sheraton was immunized from her negligence claims under the HRUS. We further hold that, inasmuch as there were no genuine issues of material fact in dispute, the circuit court correctly entered summary judgment in favor of the Sheraton and against Thompson.

Our holding accords with legislative intent and with this court's holding in *Crichfield.*[12] Moreover, unlike *Crichfield,* there is no dan-

---

ational purposes and as long as the user has not been granted the exclusive right to make use of the premises for recreational activities; or

C. For an injury caused, by acts of persons to whom permission to pursue any recreational ... activities was granted, to other persons to whom the person granting permission, or the owner ... or occupant of the premises, owed a duty to keep the premises safe or to warn of danger.

5. **No duty created.** Nothing in this section creates a duty of care or ground of liability for injury to a person or property.

The Maine statute does not contain an equivalent to HRS § 520–4(b), *see supra* note 2, which ap-

plies the liability limits set forth in HRS § 520–4(a), *see supra* section III.A.1.a, to public access areas provided by owners under state or county compulsion. Nevertheless, inasmuch as HRS § 520–4(b) merely expands the geographic reach of the protections afforded by HRS § 520–4(a) and inasmuch as HRS § 520–4(a)(1) to (3) is substantially similar to Me.Rev.Stat. Ann. tit. 14, § 159–A(3), the analytical power of the *Hafford* court's reasoning as applied to Thompson's arguments remains undiminished.

12. Indeed, in *Crichfield,* the court characterized "permitting public access to the beach and ocean" as a recreational purpose. 93 Hawai'i at 487, 6 P.3d at 359.

ger in the present matter that this ruling will allow owners to exploit the HRUS to avoid liability for activities related to them or from which they benefit.[13]

## IV. *CONCLUSION*

In light of the foregoing, this court affirms the circuit court's August 18, 2003 judgment in favor of the Sheraton and against Thompson.

Concurring Opinion by ACOBA, J., with whom DUFFY, J. joins.

I concur in the result only on the grounds that (1) *Crichfield v. Grand Wailea,* 93 Hawai'i 477, 6 P.3d 349 (2000), relied on by the parties on appeal, is inapposite where the liability of an access owner such as Defendant–Appellee Kyo–Ya Company, Ltd. dba Sheraton–Maui Hotel (Sheraton) under Hawai'i Revised Statutes chapter 520, the Hawai'i Recreational Use Statute (HRUS), is involved, (2) the majority's dependence on *Hafford v. Great N. Nekoosa Corp.,* 687 A.2d 967 (Me.1996), and the recreational use statute of Maine is wrong, and (3) the limited liability granted an access owner must rest on an objective view of the circumstances as to whether a plaintiff such as Plaintiff–Appellant Letizia Thompson (Plaintiff), injured on access land, sought to use or did use adjacent

property for a recreational purpose as that purpose is defined in HRS § 520–1 (1993). Thus, in my view, an application of HRS § 520–4(b) (Supp.2005) of the HRUS which affords limited liability [1] to a landowner who is legally required or compelled to provide access or a parking lot [collectively, "access"] to enable a person to "reach or use" recreational land,[2] requires a determination from an objective viewpoint of whether the person seeks to engage or did engage in *an activity* that falls within the definition of a "recreation purpose." *See* HRS § 520–2 (Supp. 2005).

### I.

The parties contend that *Crichfield* applies directly to this case and that the question for this court is whether Plaintiff had a "commercial purpose" or an "exclusively recreational purpose" when she was injured. The positions of the parties are not surprising inasmuch as this court had held in *Crichfield* that if land is being used for a "commercial purpose" at the time of a plaintiff's injury, the HRUS would not afford a defense. 93 Hawai'i at 489, 6 P.3d at 361. Alternatively, according to *Crichfield,* if a plaintiff is present on the land with an "exclusively recreational purpose," HRUS would be available as a defense to the claim. *Id.*

---

**13.** This court offers no opinion as to whether commercial purposes related to the owner comprise the entirety of possible non-recreational uses that plaintiffs may allege to avoid application of HRS ch. 520. In *Crichfield,* the business-invitee nature of the plaintiffs' allegations and this court's concern that commercial establishments could abuse the HRUS as an improperly broad shield from negligence liability led us to that holding.

**1.** Hawai'i Revised Statutes (HRS) § 520–4 (Supp.2005) states as follows:

**Liability of owner limited.** (a) Except as specifically recognized by or provided in section 520–6, an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not:

(1) Extend any assurance that the premises are safe for any purpose;

(2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;

(3) Assume responsibility for, or incur liability for, any injury to person or property

caused by an act of omission or commission of such persons; and

(4) Assume responsibility for, or incur liability for, any injury to person or persons who enter the premises in response to an injured recreational use.

(b) An owner of land who is required or compelled to provide access or parking for such access through or across the owner's property because of state or county land use, zoning, or planning law, ordinance, rule, ruling, or order, to reach property used for recreation purposes, or as part of a habitat conservation plan, or safe harbor agreement, shall be afforded the same protection as to such access, including parking for such access, as an owner of land who invites or permits any person to use that owner's property for recreational purposes under subsection (a).

**2.** "Land," as defined in HRS 520–2 "means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to realty, *other than lands owned by the government."* (Emphasis added.)

In determining whether a purpose is "exclusively recreational," this court proposed looking at both the intent of the landowner and the user's subjective intent for his or her presence on the land. Citing *Crichfield*, the majority states that " 'the subjective intent of an owner is obviously relevant to whether he or she has directly or indirectly invited or permitted an injured party to use the land without charge for a recreational purpose' ... [and] that the entrant's subjective intent is also material." Majority op. at 477, 146 P.3d at 1054; *see* 93 Hawai'i at 487–88, 6 P.3d at 359–60 (determining that there was a question of fact as to whether the injured party and her husband were on the hotel grounds for a commercial purpose, patronizing the hotel café, or were there for purely recreational purposes such as viewing the hotel grounds).

Here, applying the *Crichfield* analysis, there plainly was not an *"exclusively* recreational purpose" in Plaintiff's subjective intent. 93 Hawai'i at 489, 6 P.3d at 361 (emphasis added). As the majority states, the incident occurred when Plaintiff, "a certified scuba instructor working as an independent contractor for Pacific Dive, a business located in Lahaina, led three students on a nighttime dive near the Sheraton at a location known as Black Rock." Majority opinion at 473, 146 P.3d at 1050. It appears fairly clear that Plaintiff was a part of a commercial enterprise, was paid for her instruction, and was engaged in an activity that contributed to her livelihood. Thus, under the *Crichfield* test her subjective intent was not to engage in an "exclusively recreational purpose" and her claim would not be precluded under the HRUS.

As mentioned above, *Crichfield* also states that "the subjective intent of an 'owner' of 'land' is obviously relevant to whether he or she has directly or indirectly invited or permitted an injured party to 'use' the 'land' ... for a 'recreational purpose.' " 93 Hawai'i at 487, 6 P.3d at 359. However, *Crichfield* is not relevant in this case insofar as it focuses on the intent of the landowner. For the landowner's intent is irrelevant where the landowner is "required or compelled" to provide access in order to allow ingress and egress to recreational land. *See* HRS § 520–4(b). Hence, the owner's subjective intent as

to the "use" of his property is simply not pertinent. There is no question in this case that Sheraton was required to provide beach access and free parking. As the majority states, "the Sheraton was required to provide beach access and free parking as part of the requirements for obtaining its state and county building and use permits." Majority opinion at 475, 146 P.3d at 1052 n. 3. Therefore, *Crichfield* is inapposite if the subjective intent criterion is applied.

## II.

The parties rely on *Crichfield* as this court's last pronouncement on HRS chapter 520. The majority perceives that "[a]n ambiguity exists in the present matter as to whether an activity ... can be transformed from a recreational use into a non-recreational one solely by virtue of the plaintiff's subjective reasons for engaging in the activity." Majority opinion at 479, 146 P.3d at 1056. The majority asserts that this court should

approach the analysis of whether a HRUS defense is available to the Sheraton in the present matter *by seeking an outcome that ... "promot[es] the use and enjoyment of Hawaii's resources" by "encourag[ing] wider access to lands and waters* for ... fishing and other activities," while respecting traditional duties owed by landowners to non-recreational entrants.

Majority opinion at 479–80, 146 P.3d at 1056–57 (emphasis added).

However, as noted *supra*, Sheraton did not provide public access to the ocean because of the perceived benefits of HRUS. It "was required to [do so] ... as part of the requirements for obtaining its state and county building and use permits." Majority opinion at 475, 146 P.3d at 1052 n. 3. Thus, the majority's stated purpose of "encourag[ing] wider access to land and waters," majority opinion at 479, 146 P.3d at 1056, is not germane. An owner that is required or compelled to provide access cannot be said to be susceptible to entreaties to do an act it is already legally compelled to perform.

Furthermore, *Hafford*, which the majority finds "persuasive," majority opinion at 481,

146 P.3d at 1058, and the Maine statute involved,[3] are not relevant models upon which to base our interpretation of HRS § 520–4(b).

First, it should be noted that Maine Revised Statutes Annotated (MRSA) tit. 14 § 159–A is far broader in scope than HRS § 520–4. Whereas HRS § 520–4(a) extends immunity *only* to an owner who "directly or indirectly invites or permits ... any person to use the property," MRSA § 159–A excludes "[a]n owner, lessee, manager, holder of an easement or occupant of *premises,*" from "a duty of care" *"regardless* of whether the owner, lessee, manager, holder of an easement or occupant has given permission to another to pursue recreational or harvesting activities [(recreational activity)] on the premises." (Emphases added.) Under the Maine statute "premises" is not limited to "access or parking," HRS § 520–4(b), but includes "improved and unimproved lands, private ways, roads, any buildings or structures on those lands and waters ... adjacent to those lands," MRSA 159–A(1)(A), without regard to authorization by way of "state or county land use, zoning, or planning law, ordinance, rule, ruling, or order[,]" HRS § 520–4(b). Furthermore, "encouraging wider access," majority opinion at 479, 146 P.3d at 1056, through recreational land owner "invit[ation] or perm[ission]," HRS § 520–4(a), plays no part at all in the Maine law

inasmuch as the statute itself flatly authorizes the use of "premises." Accordingly, Maine has determined that limitation of liability under this section provides no basis for distinguishing between commercial and noncommercial premises. *See Stanley v. Tilcon Maine, Inc.,* 541 A.2d 951, 953 (Me.1988).

But most significantly, none of the analysis as to recreational use engaged in by the majority is relevant, for the Maine statute itself equates "passage over premises," *i.e.,* access, in order to pursue "recreational or harvesting activities" *as a recreational activity itself. See supra* note 3 (stating that " '[r]ecreational or harvesting activities' means recreational activities conducted out-of-doors, [and] ... includes entry of ... premises" (quoting MRSA § 159–A(1)(B))). Thus, it was entirely predictable, as the Maine court concluded, "that Hafford's travel over Great Northern's land was an action in pursuit of the use of property for recreation even though Hafford was paid by his customers to provide transportation," inasmuch as "the statute defines 'recreational activity' as '... includ[ing] entry, use of and passage over premises in order to pursue these activities' " (emphasis added) and the Maine court "construe[s] the immunity provision of section 159–A broadly." *Hafford,* 687 A.2d at 969 (citations omitted).

**3.** 14 Maine Revised Statutes Annotated (MRSA) tit. 14, § 159–A states in pertinent part as follows:

 **1. Definitions.** As used in this section, unless the context indicates otherwise, the following terms have the following meanings:

 **A.** *"Premises" means improved and unimproved lands, private ways, roads, any buildings or structures on those lands and waters standing on, flowing through or adjacent to those lands.* "Premises" includes railroad property, railroad rights-of-way and utility corridors to which public access is permitted.

 **B.** *"Recreational or harvesting activities" means* recreational activities conducted out-of-doors, including, but not limited to, hunting, fishing, trapping, camping, environmental education and research, hiking, recreational caving, sight-seeing, operating snow-traveling and all-terrain vehicles, skiing, hang-gliding, dog sledding, equine activities, boating, sailing, canoeing, rafting, biking, picnicking, swimming or activities involving the harvesting or gathering of forest, field or

marine products. *It includes entry of,* volunteer maintenance and improvement of, *use of and passage over premises in order to pursue these activities.* "Recreational or harvesting activities" does not include commercial agricultural or timber harvesting.

 **C.** "Occupant" includes, but is not limited to, an individual, corporation, partnership, association or other legal entity that constructs or maintains trails or other improvements for public recreational use.

 **2. Limited duty.** An owner, lessee, manager, holder of an easement or occupant of premises does not have a duty of care to keep the premises safe for entry or use by others for recreational or harvesting activities or to give warning of any hazardous condition, use, structure or activity on these premises to persons entering for those purposes. *This subsection applies regardless of whether the owner, lessee, manager, holder of an easement or occupant has given permission to another to pursue recreational or harvesting activities on the premises.*

(Emphases added.)

In contrast, under HRS § 520–4(b), access itself is not a designated recreational activity, and could only commonsensically be rendered so by express legislative direction—a course the Hawai'i legislature obviously did not choose. Under Hawaii's legislative history, immunity attaches to HRS § 520–4(b) owners because the law mandates provision of the access, and not because entry onto land is defined under the statute as synonymous with a recreational activity such as swimming. *See* discussion *infra*.

Second, *Maine* courts have held that their recreational use statute is to be liberally construed in favor of landowners. The Maine Supreme Court broadly construes the statutory provision granting property owners immunity from liability for failing to keep premises safe for use for recreational activities. *See Hafford*, 687 A.2d at 969 (stating that "[w]e construe the immunity provision of section 159–A broadly"). In view of the fact that the immunity provision of the statute limiting liability for recreational or harvesting activities was to be construed broadly, an exception to the provision would be construed narrowly. *See Robbins v. Great Northern Paper Co.*, 557 A.2d 614, 616 (Me. 1989) (stating that, "[b]ecause we construe the immunity provision of section 159–A broadly, we interpret the . . . exception narrowly" (citations omitted)).

The opposite is true, however, under HRUS. By the express terms of the statute, "encouragement," as wrought by the legislature is in the form of the limited liability afforded landowners who chose to invite or permit users onto its land. *See* HRS § 520–1 (stating, "[t]he purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes *by limiting their liability*

towards persons entering thereon for such purposes[ ]" (emphasis added)). Accordingly this court (at least in the past), as have most courts, deigned to afford a liberal construction in favor of the landowner.[4] In *Crichfield*, moreover, this court seemingly rejected a construction given HRS Chapter 520 by the Ninth Circuit favoring the landowner. 93 Hawai'i at 486–87, 6 P.3d at 358–59. It was stated that, "[w]ere we to apply the *Howard* rule that a plaintiff's subjective intent is immaterial to whether HRUS applies to immunize a landowner, then the Crichfields' allegedly 'commercial' purpose underlying their presence at the hotel would not defeat the application of HRUS." *Id.* (citing *Howard v. U.S.*, 181 F.3d 1064, 1073 (9th Cir.1999)). In adopting *Hafford* and its internal construction of the Maine statute, the majority imposes Maine's interpretation of its dissimilar statute upon Hawaii's more balanced statutory provisions—thus effecting a judicial amendment of the HRUS.

### III.

A different and more straightforward analysis is suited to HRS § 520–4(b). By its plain language, HRS § 520–4(a) limits the liability of a landowner who "invites or permits without charge any person to use the property for recreational purposes":

> (a) Except as specifically recognized by or provided in section 520–6, *an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not:*
>
> (1) Extend any assurance that the premises are safe for any purpose;

4. Courts in other states have refused to adopt a policy of liberally construing recreational use statutes in favor of the landowner. *See Matthews v. Elk Pioneer Days*, 64 Wash.App. 433, 824 P.2d 541, 543 (1992) (noting that *the Wisconsin statute differs significantly from Washington's* recreational use statute in that Washington does not provide for a policy of liberal construction in favor of the landowner); *see also Smith v. Arizona Bd. of Regents*, 195 Ariz. 214, 986 P.2d 247 (1999) (distinguishing Wisconsin's statute from that of Arizona's in that Wisconsin's statute is *"liberally construed in favor of property owners to*

*protect them from liability."* (emphasis added)); *Monteville v. Terrebonne Parish Consol. Gov't*, 567 So.2d 1097 (La.1990) (finding that "the great majority of courts in other states (states other than Wisconsin) interpreting recreational use statutes have held that because the statutes are in derogation of the common law and because they limit the duties of landowners in the face of a general expansion of premises liability principles, *they must be strictly construed* [ ]" (citing *Boileau v. DeCecco*, 125 N.J.Super. 263, 310 A.2d 497 (1973) (emphasis added))).

(2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;

(3) *Assume responsibility for, or incur liability for, any injury to person or property caused by an act of omission or commission* of such persons; and

(4) Assume responsibility for, or incur liability for, any injury to person or persons who enter the premises in response to an injured recreational user.

(Emphases added.)

On the other hand, HRS § 520–4(b) extends to a landowner who is legally "required or compelled to provide access or parking ... to reach property used for recreation purposes" the same limited liability protection as a landowner under HRS § 520–4(a), as discussed *supra:*

(b) *An owner of land who is required or compelled to provide access or parking* for such access through or across the owner's property because of state or county land use, zoning, or planning law, ordinance, rule, ruling, or order, *to reach property used for recreation purposes,* or as part of a habitat conservation plan, or safe harbor agreement, *shall be afforded the same protection as to such access, including parking for such access, as an owner of land who invites or permits any person to use that owner's property for recreational purposes under subsection (a).*

(Emphases added.) Therefore, HRS § 520–4(b), by its express terms, imputes the limited liability afforded to a landowner who "invites or permits without charge any person to use the property for recreational purposes" to a landowner who is "required or compelled to provide access or parking ... through or across the owner's property ... to reach property used for recreational purposes[.]"

The legislative history of HRS § 520–4(b), however, indicates that different considerations motivated the legislature in enacting HRS § 520–4(b), affording immunity to an access landowner, as opposed to a 520–4(a), immunizing landowners that "invite or permit" others to use their land for recreational purposes. The legislature said that "in light of the United States Supreme Court cases of *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) and *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), the issue of takings may arise when a government *mandates* public access over private property." Sen. Stand. Comm. Rep. No. 1648, in 1996 Senate Journal, at 837 (emphasis added). Accordingly, there was concern that "if the government mandates access and subsequently prohibits a landowner from protecting itself from tort liability by way of a waiver, this may exacerbate the current situation and further preclude the provision of public access to recreational areas by private landowners." *Id.*

## IV.

Within the framework of HRS § 520–4(b), then, the mandated access is for the accommodation of persons entering or using "property used for recreational purposes." Unlike Maine's statute, under HRS 520–2 a recreational user "means any person who. is on or about the premises that the owner of land either directly or indirectly invites or permits, ... onto the property for recreational purposes." HRS § 520–2. Hence in Hawai'i, unlike Maine, a user must be a person who is on the recreational premises because of an invitation or the permission of the owner.

Unlike the owner of recreational land, the access owner does not choose to "invite[ ] or permit[ ] any person," HRS § 520–4(a), to use its property for recreational purposes. Also unlike the owner of recreational property, the access owner has no control over the status of persons engaging in recreational activity on the land served by the access. *See Crichfield,* 93 Hawai'i at 488, 6 P.3d at 360 (noting that the legislative history indicates that the purpose of the HRUS was "to limit the liability of landowners who permit persons to use their property for recreational purposes without charge[,]" and that it would "not affect the landowners' *common law duty* of care towards house guests, business invitees, playmates of his [or her] children[ ]" (emphasis added) (citation omitted)). Thus,

the access owner's immunity stems from utilization of the access for the purpose of reaching [5] the adjacent property for a recreational purpose. Hence, if a plaintiff is engaged in a recreational activity on adjacent recreational property, then the access owner, as exemplified in the express language of HRS § 520–4(b) and its legislative history, should be immune to the extent set forth in HRS § 520–4(a). In applying HRS § 520–4(b), the focus, then, should be on whether, viewing the circumstances objectively, the user sought to use or did use the adjacent land for a "recreation[al] purpose," *i.e.,* a specific activity as defined in HRS § 520–2.

## V.

In that regard and contrary to the majority's assertion that resorting to the plain language of HRS § 520 is "of limited value," majority opinion at 1054, the import of the phrase "property used for recreation purposes" is quite clear. Property is not defined in the statute. However, giving "property" its ordinary meaning, *see* HRS § 1–14 (stating that "words of law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning"), the term is defined as "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised," *Black's Law Dictionary* 1252 (8th ed.1999). The adjacent property served by Sheraton's access property here was the ocean where the scuba diving took place. The government is the owner of the ocean. Although the HRUS does not extend immunity to the government for injuries occurring in the ocean, *see supra* note 2; *see also, Lansdell v. County of Kaua'i,* 110 Hawai'i 189, 195, 130 P.3d 1054, 1060 (2006) (concluding that under its provisions HRS chapter 520 does not apply to "land" owned by the government, ocean waters constitute lands owned by the government; accordingly Ha-

waii's recreational user statute does not extend immunity to the government if the injury occurred in the ocean) in light of the ordinary meaning of the term "property" in HRS § 520–4(b), *see supra,* the ocean would be included, even if not privately owned, inasmuch as in the absence of other facts, use of *property,* insofar as the access owner is concerned, is all that is required.

HRS § 520–2 also defines "Recreational purpose," and "includes but is not limited to any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites." Because the statute enumerates activities within the scope of the general reference to "recreational purpose," it is easily discerned that scuba diving is similar in nature to such water sports as swimming, fishing or boating. The "term 'includes' is ordinarily a term of enlargement, not of limitation; a statutory definition of thing as 'including' certain things does not necessarily impose a meaning limited to inclusion." *Schwab v. Ariyoshi,* 58 Haw. 25, 35, 564 P.2d 135, 141 (1977) (citations omitted); *see also In re Waikoloa Sanitary Sewer Co., Inc.,* 109 Hawai'i 263, 274, 125 P.3d 484, 495 (2005) (stating that "[t]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principal[ ]" (quoting *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 99–100, 62 S.Ct. 1, 86 L.Ed. 65 (1941))).

Given its ordinary meaning, "scuba diving" is "the activity or recreation of diving or exploring underwater through use of a scuba device." Dictionary.com Unabridged (v 1.0.1), based on the Random House Unabridged Dictionary, © Random House, Inc. 2006. "Scuba" is "an apparatus used for breathing while swimming under water[.]" *Webster's Third New Int'l Dictionary* 2043 (1961). Scuba diving, then, involves swim-

---

5. Even if HRS § 520–4(b) does not refer to the use of the path for *returning* from the recreational land, as occurred in this case, to decide otherwise would impose an absurd construction on HRS § 520–4(b). *See Bowers v. Alamo Rent-A-Car, Inc.,* 88 Hawai'i 274, 277, 965 P.2d 1274,

1277 (1998) (stating that "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality" (internal quotation marks and citation omitted) (brackets in original)).

ming underwater with scuba gear. Because the activity engaged in here is akin to swimming, it fits within the definition of "recreation[al] purpose." Furthermore, Plaintiff concedes that "scuba diving can be recreational and is similar to other 'recreational' activities listed in [HRS § 520–2], *e.g.,* fishing, swimming and water skiing." Majority opinion at 476, 146 P.3d at 1053 n. 4.

With all due respect the majority's view that "where the plaintiff's presence on the land is *closely associated* with the presence of individuals whose purpose on the land is purely recreational, the recreational purpose attaches to the plaintiff[,]" majority opinion at 481, 146 P.3d at 1058 (emphasis added), is not helpful. "Closely associated" is an ambiguous criterion that will engender disparate and conflicting results rather than establish a clear and uniform rule and seems fashioned to fit the result obtained in this case. Rather, based on the defined terms in the HRUS itself, the disposition of a plaintiff's claim for injury suffered on the access should depend on whether the plaintiff was "on or about the premises" of the recreational landowner "for recreational purposes." Inasmuch as recreational purpose is defined in the statute itself, "recreational user" needs no further explication: if Plaintiff was engaged in an activity encompassed within the term recreational purpose, she was a recreational user. In this case, then, it is irrelevant that Plaintiff was an instructor, inasmuch as at the least she engaged in an activity, *i.e.,* scuba diving, encompassed within the "recreational purpose[6]" definition. The same would apply to the majority's reference to "a member of the group paid to guide or instruct others," majority opinion at 1058, assumably a "member" of the group that was engaged in scuba diving—whether instructor or student—would still be partaking in the scuba-diving activity.

Based on HRS § 520–4(b), then, the relevant question should be whether from an objective viewpoint, it can be concluded that Plaintiff used Sheraton's beach-access path in order to engage in a "recreation purpose,"

*i.e.,* a HRS § 520–2 defined activity, on the property served by the path, here the adjacent beach and ocean. HRS § 520–2; *see Linville v. City of Janesville,* 174 Wis.2d 571, 497 N.W.2d 465, 469 (App.1993) (stating that "we apply an objective test to the undisputed facts to determine whether an injured person was engaged in a 'recreational activity,'" a test which "requires examination of all aspects of the activity[ ]" (citation omitted)); *see also Iannotti v. Consolidated Rail Corp.,* 74 N.Y.2d 39, 544 N.Y.S.2d 308, 312, 542 N.E.2d 621 (1989) (noting that "[t]here is nothing in the statute (New York's recreational use statute) or its history suggesting that the Legislature intended its application should turn on the subjective intent of the injured person when engaging in one of the enumerated activities[ ]"); *cf. Doe Parents No. 1 v. State, Dept. of Educ.,* 100 Hawai'i 34, 69, 58 P.3d 545, 580 (2002) (noting that this court adopted an objective standard in holding that "serious mental distress may be found *where a reasonable [person],* normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case" (emphasis added) (internal quotation marks and citation omitted)); *Rodrigues v. State,* 52 Haw. 156, 173, 472 P.2d 509, 520 (1970) (adopting an objective standard in holding that "serious mental distress may be found *where a reasonable [person],* normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case" (emphasis added)).

In sum, Plaintiff used Sheraton's beach-access path to reach the ocean where she led three students on a nighttime scuba dive. Scuba diving is a "recreational purpose" under HRS § 520–2 as it is encompassed within the activity of swimming, an enumerated "recreational purpose" under HRS § 520–2. Because the activity, *i.e.,* scuba diving, for which the property, *i.e.,* the ocean, was "reached or used" falls within the definition of a "recreational purpose," the HRUS applies and Sheraton, pursuant to HRS § 520–4(b), is afforded limited immunity under

---

**6.** The term "purpose" itself includes "an object, effect, or result aimed at, intended, or attained."

*Webster's Third New Int'l Dictionary* 1847 (1961).

HRS § 520–4(a). Therefore, Sheraton is immunized from Plaintiff's negligence suit.