**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000792**
**29-SEP-2021**
**02:42 PM**
**Dkt. 69 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

JESSICA L. JACOBS and JOHN N. JACOBS,
Plaintiffs-Appellants,
v.
BILLY CASPER GOLF, LLC; BANK OF HAWAII, AS TRUSTEE OF THE
KUKUIOLONO PARK TRUST ESTATE; KUKUIOLONO PARK AND GOLF COURSE;
KUKUIOLONO PARK TRUST ESTATE; KUKUIOLONO MANAGEMENT, LLC,
Defendants-Appellees,
and
JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10;
DOE CORPORATIONS 1-10; ROE "NON-PROFIT" CORPORATIONS 1-10;
and ROE GOVERNMENTAL ENTITIES 1-10, Defendants

NO. CAAP-16-0000792

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CIVIL NO. 14-1-0212)

SEPTEMBER 29, 2021

GINOZA, C.J., WADSWORTH AND NAKASONE, JJ.

OPINION OF THE COURT BY WADSWORTH, J.

Plaintiffs-Appellants Jessica L. Jacobs (**Jessica**) and
John N. Jacobs (**John**) (collectively, the **Jacobses**) appeal from
the November 29, 2016 Final Judgment (**Judgment**), entered by the
Circuit Court of the Fifth Circuit (**Circuit Court**), in favor of
Defendants-Appellees Billy Casper Golf, LLC (**BCG**); Bank of
Hawaii, as Trustee of the Kukuiolono Park Trust Estate (**BoH**);

Kukuiolono Park and Golf Course (**KPGC**); Kukuiolono Park Trust Estate; and Kukuiolono Management, LLC (**KM**) (collectively, the **KPGC Defendants**).[1/]  The Jacobses also challenge the Circuit Court's October 11, 2016 "Order Granting [the KPGC] Defendants' Motion for Summary Judgment, Filed 07/20/16" (**Order Granting Summary Judgment**).[2/]

On appeal, the Jacobses contend that the Circuit Court erred in granting summary judgment against them and in favor of the KPGC Defendants.  The Jacobses argue there were genuine issues of material fact as to whether the Hawaiʻi Recreational Use Statute (**HRUS**), Hawaii Revised Statutes (**HRS**) Chapter 520, quoted infra, immunized the KPGC Defendants from tort liability for the Jacobses' personal injuries.

We hold that the Circuit Court correctly concluded there was no genuine issue of material fact that:  (1) the KPGC Defendants were "owners" of land as defined by the HRUS for purposes of applying the statute's immunity provisions; and (2) on the day she was injured, Jessica was on the KPGC premises for a "recreational purpose," within the meaning of the HRUS. We further hold, however, that the Circuit Court erred in concluding there were no genuine issues of material fact as to whether the KPGC Defendants knowingly created or perpetuated, and wilfully or maliciously failed to guard or warn against, an alleged dangerous condition on the KPGC premises.  Accordingly, we vacate the Judgment and remand the case to the Circuit Court for further proceedings consistent with this opinion.

## I.  Background

This appeal arises out of a personal injury lawsuit brought by Jessica and her husband John against the KPGC Defendants.  The following facts are undisputed:  On February 16, 2013, at about 5:30 p.m., Jessica entered the grounds of

---

[1/]    The Honorable Kathleen N.A. Watanabe presided.

[2/]    The Jacobses filed their notice of appeal on November 9, 2016, after the Circuit Court's announcement of its decision by way of the Order Granting Summary Judgment, but before entry of the Final Judgment.  Pursuant to Hawaiʻi Rules of Appellate Procedure Rule 4(a)(2), the notice of appeal is deemed filed immediately after entry of the Final Judgment.

Kukuiolono Park and Golf Course, in Kalāheo, Kauai, by car. There was no charge to enter, and Jessica did not purchase anything at KPGC that day. As she had done on prior occasions, Jessica went to KPGC that day to feed or water chickens on the park grounds. Jessica parked her car in a parking lot adjacent to a grassy area of the golf course – an area that is bordered by trees and other vegetation. Jessica was standing in the grassy area on the right side of her car, when she was struck by a large tree branch that fell on her. Jessica suffered a fractured left ankle that required surgery and rehabilitation treatment.

On October 28, 2014, Jessica and John filed a Complaint against the KPGC Defendants. Jessica asserted a claim for negligence and John asserted a claim for loss of consortium. On January 2, 2015, Jessica and John filed a First Amended Complaint alleging the same claims.

Following discovery, on July 20, 2016, the KPGC Defendants filed a motion for summary judgment. The KPGC Defendants argued that the Jacobses' personal injury claims were barred by the HRUS as a matter of law. In support of their motion, the KPGC Defendants submitted various declarations, deposition excerpts and documents to establish the requisites for invoking the liability protections of the HRUS. Based on this evidence, the KPGC Defendants argued that: (1) KPGC was open to the public; (2) KPGC was open for "recreational purposes"; (3) admission to KPGC was without charge; (4) the KPGC Defendants did not engage in a "wilful or malicious" failure to guard or warn against a dangerous condition; (5) Jessica was not the KPGC Defendants' "house guest"; and (6) all of the KPGC Defendants were entitled to summary judgment because they were all "owners" within the meaning of the HRUS.

On September 16, 2016, the Jacobses filed their memorandum in opposition to the KPGC Defendants' motion for summary judgment. In support of their opposition, the Jacobses argued that there were genuine issues of material fact as to whether the HRUS immunized the KPGC Defendants from the Jacobses' personal injury claims, which precluded summary judgment. The Jacobses submitted various declarations, deposition excerpts and

3

documents to demonstrate the facts that presented a genuine issue for trial.  Based on this evidence, the Jacobses argued that: (1) "wilful or malicious" conduct was a question of fact for the jury and was not appropriate for summary judgment; (2) there was a genuine issue of material fact as to whether the KPGC Defendants' alleged failure to guard or warn was wilful or malicious; (3) the KPGC Defendants were not within the class of "owners" that the HRUS was meant to protect; and (4) Jessica's feeding of chickens (or cats) at KPGC was not a recreational purpose under the HRUS.

On September 22, 2016, the KPGC Defendants filed a reply memorandum in support of their motion for summary judgment.

On September 27, 2016, the motion for summary judgment was heard by the Circuit Court.  Following extensive oral argument by both sides, the Circuit Court granted the motion for summary judgment.  On October 11, 2016, the Circuit Court entered the written Order Granting Summary Judgment.

On November 29, 2016, the Circuit Court entered the Judgment.  The Jacobses filed a timely notice of appeal.

## II.  Points of Error

The Jacobses raise five points of error on appeal,[3/] contending that:

1.  The Circuit Court's grant of summary judgment was in error because the court applied the KPGC Defendants' "self-styled five-prong test, which is not a valid legal standard under Hawaiʻi law."

2.  The Circuit Court erred in not considering whether any of the KPGC Defendants is "an 'owner' as contemplated under [HRS] § 520-2 before granting all [of the KPGC Defendants] immunity from liability."

3.  The Circuit Court erred in finding that Jessica's activity at KPGC on the date of the incident "was for a 'recreational purpose' as contemplated under [HRS] § 520-2."

4.  "Whether [the KPGC Defendants'] conduct was wilful or malicious is an issue of fact for the jury and not appropriate

_____

[3/]     The Jacobses' points of error have been reordered for organizational clarity.

4

for summary . . . adjudication."

5. Even if wilful or malicious conduct was an appropriate issue for summary adjudication, the Circuit Court erred "in failing to consider whether [the KPGC Defendants'] conduct was wilful or malicious for failing to warn or guard against a dangerous condition that they created or perpetuated . . . ."

## III. Standards of Review

### A. Summary Judgment

An appellate court reviews a trial court's grant or denial of summary judgment de novo using the same standard applied by the trial court. Nozawa v. Operating Eng'rs Local Union No. 3, 142 Hawaiʻi 331, 338, 418 P.3d 1187, 1194 (2018) (citing Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 12, 346 P.3d 70, 81 (2015)). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. at 342, 418 P.3d at 1198 (quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81) (brackets omitted). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Id. (quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81).

The moving party has the burden to establish that summary judgment is proper. Id. (citing French v. Haw. Pizza Hut, Inc., 105 Hawaiʻi 462, 470, 99 P.3d 1046, 1054 (2004)). "Once a summary judgment movant has satisfied its initial burden of producing support for its claim that there is no genuine issue of material fact, the party opposing summary judgment must 'demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.'" Id. (quoting Lales v. Wholesale Motors Co., 133 Hawaiʻi 332, 359, 328 P.3d 341, 368 (2014)) (brackets omitted). "The evidence must be viewed in the light most favorable to the non-moving party." Id.

(quoting Adams, 135 Hawaiʻi at 12, 346 P.3d at 81) (brackets omitted).

## B.    Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo."  McLaren v. Paradise Inn Hawaii LLC, 132 Hawaiʻi 320, 327, 321 P.3d 671, 678 (2014) (citing Lindinha v. Hilo Coast Processing Co., 104 Hawaiʻi 164, 171, 86 P.3d 973, 980 (2004)).  When construing a statute, we apply well-settled principles of statutory construction:

> We first examine the language of the statute itself.  [State v. ]Choy Foo, 142 Hawaiʻi [65, ]72, 414 P.3d [117, ]124[ (2018)].  If the language is plain and unambiguous, we must give effect to its plain and obvious meaning.  Id.  Also, implicit in statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language of the statute itself.  Id.  Finally, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.  Id.  When there is ambiguity, the meaning of ambiguous words may be sought by examining the context or resorting to extrinsic aids to determine legislative intent. Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawaiʻi 184, 194, 159 P.3d 143, 153 (2007).

State v. Carlton, 146 Hawaiʻi 16, 22, 455 P.3d 356, 362 (2019).

## IV.    Discussion

## A.    The Hawaiʻi Recreational Use Statute

The statutorily defined purpose of the HRUS is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." HRS § 520-1 (2006).  "The heart of [the] HRUS immunizes an owner of land from liability to any person who enters or uses the owner's land for recreational purposes[.]"  Crichfield v. Grand Wailea Co., 93 Hawaiʻi 477, 484, 6 P.3d 349, 356 (2000).

Specifically, HRS §§ 520-3 and 520-4 (2006) limit the legal duties and liabilities of landowners as follows:

> **§ 520-3  Duty of care of owner limited.**  Except as specifically recognized or provided in section 520-6, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure,

or activity on such premises to persons entering for such purposes, or to persons entering for a purpose in response to a recreational user who requires assistance, either direct or indirect, including but not limited to rescue, medical care, or other form of assistance.

> **§ 520-4 Liability of owner limited.** (a) Except as specifically recognized by or provided in section 520-6, an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not:
>
> > (1) Extend any assurance that the premises are safe for any purpose;
> >
> > (2) Confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed;
> >
> > (3) Assume responsibility for, or incur liability for, any injury to person or property caused by an act of omission or commission of such persons; and
> >
> > (4) Assume responsibility for, or incur liability for, any injury to person or persons who enter the premises in response to an injured recreational user.
>
> (b) An owner of land who is required or compelled to provide access or parking for such access through or across the owner's property because of state or county land use, zoning, or planning law, ordinance, rule, ruling, or order, to reach property used for recreation purposes, or as part of a habitat conservation plan, or safe harbor agreement, shall be afforded the same protection as to such access, including parking for such access, as an owner of land who invites or permits any person to use that owner's property for recreational purposes under subsection (a).

In turn, HRS § 520-6 (2006) states:

> **§ 520-6 Persons using land.** Nothing in this chapter shall be construed to:
>
> > (1) Create a duty of care or ground of liability for injury to persons or property.
> >
> > (2) Relieve any person using the land of another for recreational purposes from any obligation which the person may have in the absence of this chapter to exercise care in the person's use of such land and in the person's activities thereon, or from the legal consequences of failure to employ such care.

The immunity conferred by the HRUS is not absolute; it does not extend in three circumstances:

> **§ 520-5 Exceptions to limitations.** Nothing in this chapter limits in any way any liability which otherwise exists:

> (1)    For wilful or malicious failure to guard or warn against a dangerous condition, use, or structure which the owner knowingly creates or perpetuates and for wilful or malicious failure to guard or warn against a dangerous activity which the owner knowingly pursues or perpetuates.
>
> (2)    For injury suffered in any case where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof, except that in the case of land leased to the State or a political subdivision thereof, any consideration received by the owner for such lease shall not be deemed a charge within the meaning of this section.
>
> (3)    For injuries suffered by a house guest while on the owner's premises, even though the injuries were incurred by the house guest while engaged in one or more of the activities designated in section [520-2].

HRS § 520-5 (2006).[4/]

The Hawaiʻi Supreme Court has summarized the immunity provided by the HRUS as follows:

> [The] HRUS confers upon the "owner" of land immunity from negligence liability to any person—who is neither "charged" for the right to be present nor a "house guest"—injured on the land while that person is using the owner's land for a "recreational purpose." In other words, if a person is injured on an "owner's" land, but that person was not on the land for a "recreational purpose," HRUS does not, by its plain language, immunize the "owner" from tort liability. Moreover, pursuant to HRS § 520-5, an "owner" is not immune from tort liability, if: (1) the injury results from the owner's wilful or malicious failure to guard against or warn of either a dangerous condition, use, or structure that the owner knowingly created or perpetuated, or a dangerous activity that the owner knowingly pursued or perpetuated; (2) the owner "charged" the recreational user a fee or price of admission for the use of the land; or (3) the injury was suffered by a "house guest."

Crichfield, 93 Hawaiʻi at 485, 6 P.3d at 357; see Thompson v. Kyo-Ya Co., 112 Hawaiʻi 472, 477, 146 P.3d 1049, 1054 (2006).

### B.    "Five-Prong Test"

In their motion for summary judgment, the KPGC Defendants urged the Circuit Court to apply a "five-prong test" in determining whether they were immune from tort liability under the HRUS as a matter of law. The five prongs, derived primarily

---

[4/]    The Jacobses did not contend below, and do not contend on appeal, that Jessica was charged a fee for entry into KPGC or that she was a "house guest." Thus, of the three circumstances identified in HRS § 520-5, only HRS § 520-5(1) is at issue.

8

from the language of the HRUS, were as follows: (1) "HRUS requires land to be open to the public"; (2) "HRUS requires that the land must be open for 'recreational purposes'"; (3) "HRUS requires that admission to the property be 'without charge'"; (4) "HRUS requires that Defendants not be 'willful[5] or malicious'" (footnote added); and (5) "HRUS requires that Plaintiff not be Defendants' 'house guest[.]'"  In their motion for summary judgment, the KPGC Defendants also quoted the applicable parts of the relevant statute for each of the respective prongs.  The KPGC Defendants argued that they had satisfied each of these requirements based on the declarations, deposition excerpts, and documentary evidence submitted with their motion and were thus entitled to summary judgment as a matter of law.

Following oral argument at the hearing of the motion, the Circuit Court stated in relevant part:

> The Court has reviewed all of your respective pleadings, and, of course, in this motion before the Court, we're talking about the recreational use statute in the state, which is codified under Chapter 520 of the Hawaii Revised Statutes.
>
> And this Court having reviewed your pleadings, having listened to all of your arguments this afternoon, the Court finds that the defendants in their motion have met -- clearly met all of the five prongs of the recreational use statute.
>
> The Court finds that there are no genuine issues as to any material facts, and therefore, the Court is granting the Defendants' motion for summary judgment.

The court subsequently entered the written Order Granting Summary Judgment, which made no reference to the purported "five prongs" and simply stated in part,

> The Court, having reviewed and considered all of the oral and written submissions of the parties and the records and files herein, and good cause appearing therefore,
>
> . . . .
>
> IT IS HEREBY ORDERED that "Defendants' Motion for Summary Judgment" is hereby granted on all claims and causes of action.

---

[5]  "The term 'wilful' has two accepted spellings, 'wilful' and 'willful.'"  Iddings v. Mee-Lee, 82 Hawaiʻi 1, 3 n.1, 919 P.2d 263, 265 n.1 (1996) (citing the American Heritage Dictionary 922 (3d ed. 1994)).

On appeal, the Jacobses contend that the Circuit Court erred in granting summary judgment based on the KPGC Defendants' five-prong test.  The crux of the Jacobses' argument is that the court's analysis under the five-prong test did not include consideration of whether any of the KPGC Defendants was an "owner" of land, as defined in HRS § 520-2 (quoted infra), for purposes of the HRUS.

We agree that in considering the summary judgment motion, the Circuit Court was required to determine whether the KPGC Defendants were "owners" for purposes of the HRUS.  However, based on the record, and as further explained below, we conclude that the Circuit Court did in fact consider this issue and determined there was no genuine issue of material fact that the KPGC Defendants were such "owners."  Thus, we do not adopt the so-called five-prong test, but conclude that the Circuit Court did not err in referencing the test, as it appears from the record that the court based its ruling on the statutory requirements of the HRUS and not solely on the test.

C.    "Owner" of Land

As specified in HRS §§ 520-3 and 520-4, the HRUS immunizes an "owner" of land from liability to persons who enter or use the owner's land for recreational purposes.  Crichfield, 93 Hawaiʻi at 484, 6 P.3d at 356.  The HRUS defines "owner" as "the possessor of a fee interest, a tenant, lessee, occupant, or person in control of the premises."  HRS § 520-2.

As noted above, the Jacobses contend that the trial court erred in not considering whether any of the KPGC Defendants was an "owner" for purposes of the HRUS, before granting all of the KPGC Defendants immunity from liability.  We disagree.

Although the Order Granting Summary Judgment did not explicitly state that each of the KPGC Defendants was an "owner" within the meaning of the HRUS, the order did make clear that the Circuit Court "reviewed and considered all of the oral and written submissions of the parties and the records and files herein . . . ."  The submissions of the parties addressed in detail the Jacobses' argument that the KPGC Defendants were not

10

"'owners' that the HRUS was meant to protect." The issue was also the subject of extensive oral argument, and related questions by the Circuit Court, at the hearing of the motion for summary judgment. We are satisfied based on the record that the Circuit Court, in granting summary judgment, considered whether each of the KPGC Defendants was an "owner" within the meaning of the HRUS, and determined there was no genuine issue of material fact regarding this mixed issue of law and fact, *i.e.*, that each was an "owner."

Nevertheless, we must determine whether the Circuit Court erred in reaching this conclusion, as it is a prerequisite to the liability protections of the HRUS, and thus a foundational issue for the court's grant of summary judgment. The Jacobses argue that "[t]he HRUS does not confer immunity upon the trustee of the landowner, or the owner's property manager, or their subsidiary or subcontractor, especially when these entities have assumed paid fiduciary or contractual duties to care for and maintain the property in a safe condition." They further argue:

> [The KPGC Defendants] are not titled "owners", "tenants" or "lessees" and they are not "persons" and therefore, none of the [KPGC Defendants] can be [a] "person in control of the premises." We are left with the issue of whether any or all [of the KPGC Defendants] are "occupants" under the HRUS's definition of "owner[.]"

We address these arguments below with respect to each of the KPGC Defendants.

### 1. Kukuiolono Park Trust Estate

Under the HRUS, an "owner" includes the "possessor of a fee interest" in the property at issue. HRS § 520-2. In examining the language of the HRUS, we note that it does not define the term "possessor."

> To effectuate a statute's plain language, its words "must 'be taken in their ordinary and familiar signification, and regard is to be had to their general and popular use.'" See State v. Guyton, 135 Hawaiʻi 372, 378, 351 P.3d 1138, 1144 (2015) (quoting In re Taxes of Johnson, 44 Haw. 519, 530, 356 P.2d 1028, 1034 (1960)); see also HRS § 1-14 (2009). "In conducting a plain meaning analysis, 'this court may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.'" Guyton, 135 Hawaiʻi at 378, 351 P.3d

at 1144 (quoting State v. Pali, 129 Hawaiʻi 363, 370, 300 P.3d 1022, 1029 (2013)).

Wells Fargo Bank, N.A. v. Omiya, 142 Hawaiʻi 439, 449-50, 420 P.3d 370, 380-81 (2018).

Black's Law Dictionary defines "possessor" as "[s]omeone who has possession of real or personal property[.]" Black's Law Dictionary 1410 (11th ed. 2019). A "legal possessor" is defined as "[o]ne with the legal right to possess property, . . . as contrasted with the legal owner who holds legal title." Id.

Here, in support of their motion for summary judgment, the KPGC Defendants submitted the Declaration of Carol Tom (**Tom**), a Bank of Hawaii employee who has served as the trust officer for the Kukuiolono Park Trust for over five years. Tom authenticated an attached trust deed (**the 1918 Trust Deed**), as well as an attached compilation trust deed, reflecting the 1918 conveyance of the property at issue from Walter D. McBryde to Bank of Hawaii's predecessor in interest, Hawaiian Trust Company, Limited, as trustee, to be held in trust as the Kukuiolono Park Trust Estate for the purpose, among others, of establishing a public park on Kauai. Tom explained in her declaration that "[t]he original [1918 Trust Deed] conveyed the property to Hawaiian Trust Company as Trustee; however, Hawaiian Trust Company and Bank of Hawaii merged in 1997 and as the successor in interest, Bank of Hawaii became the Trustee."

There was no dispute below, and there is none on appeal, that the Kukuiolono Park Trust Estate qualifies as a "possessor of the fee interest" in KPGC, where Jessica was injured. During the hearing on the motion for summary judgment, the Jacobses stated: "The owner is the trust that's been set up by Walter McBride. It's the Kukuiolono Trust, your honor." This asserted legal conclusion, however, is imprecise.

> Under Hawaiʻi law, a trustee holds legal title to property for the equitable benefit of the trust's beneficiaries, thereby dividing legal and equitable interest in the trust property. See Welsh v. Campbell, 41 Haw. 106, 107 (1955)). But a trust is, nevertheless, a single bundle of interests, irrespective of its particular parts, for the benefit of the trust's beneficiaries. See James v. Gerber Products Co., 483 F.2d 944, 949 (6th Cir. 1973) ("Separating the legal and

12

> beneficial incidents of ownership in the property is a mere technical argument since there is only one interest at stake and that is the beneficiary's.").

Coon v. City & Cty. of Honolulu, 98 Hawaiʻi 233, 260, 47 P.3d 348, 375 (2002); see also Restatement (Third) of Trusts § 3(2) (2003) ("The property held in trust is the trust property.); id. cmt. b ("The term 'trust property' denotes things or the interests in things that are held in trust. . . .  When it is desired to refer to the trust property as a whole, the term 'trust estate' is often used.").

In the circumstances here, where BoH, as trustee, holds KPGC in trust for the benefit of the public, we conclude that Kukuiolono Park Trust Estate qualifies as a "possessor of the fee interest" in KPGC for purposes of the HRUS.  The liability protections of the HRUS would be meaningless if a trustee who holds legal title to trust property were protected, but the trust itself were not.  Kukuiolono Park Trust Estate thus falls within the definition of "owner," as provided in the HRUS.  The Circuit Court did not err in treating it as such for purposes of applying the immunity provisions of the HRUS.[6]

### 2.   Bank of Hawaii, as Trustee of the Kukuiolono Park Trust Estate

Under the HRUS, an "owner" includes "[an] occupant, or person in control of the premises."  HRS § 520-2.  In examining the language of the HRUS, we observe that it does not define the term "occupant" or further describe "control of the premises."

Black's Law Dictionary defines "occupant" as "[s]omeone who has possessory rights in, or control over, certain property or premises."  Black's Law Dictionary 1298 (11th ed. 2019).  This same source defines "control" as "the power or authority to manage, direct, or oversee"; "[t]o exercise power or influence

---

[6]     The KPGC Defendants asserted below and maintain on appeal that KPGC is not a legal entity and "is just a name of the location."  The Jacobses do not appear to dispute this assertion; they simply note that the management agreement between BCG and BoH (see infra) contains a paragraph headed "Park Status as a Private Operating Foundation and a Charitable Organization."  That paragraph states that the Kukuiolono Park Trust Estate is recognized as a tax-exempt charitable organization and a private operating foundation under applicable provisions of the Internal Revenue Code.

over"; "[t]o regulate or govern[.]" Black's Law Dictionary 1298 (11th ed. 2019). Thus, an "owner" within the meaning of the HRUS includes a person who has possessory rights in, or control over (*i.e.*, the power or authority to manage, direct, or oversee), the premises.

Here, the Tom declaration establishes that BoH serves as the trustee of the Kukuiolono Park Trust Estate, and in that capacity, "exercises (in conjunction with [KM]) control over Kukuiolono Park." In addition, the terms of the 1918 Trust Deed provide:

> [S]aid trustee and its successors in trust shall have large discretionary powers as to the management of said Kukuiolono Park Trust Estate and that there be no restrictions placed upon it or them other than that they act in good faith in all their business management . . . . {S]aid trustee and its sucessors in trust shall have power to sell, lease or exchange or otherwise deal with all or any part of said Kukuiolono Park Trust Estate as such prices and terms and conditions and in such manner as it or they may deem best . . . .

There was no dispute below, and there is none on appeal, that BoH, as trustee, has the power or authority to manage, direct, or oversee KPGC. Rather, the Jacobses contend that the KPGC Defendants, including BoH, are not "persons," and thus none of them can be a "person in control of the premises."

In making this argument, the Jacobses ignore HRS § 1-19 (2009), which states in relevant part:

> The word "person" . . . signif[ies] not only individuals, but corporations, firms, associations, societies, communities, assemblies, inhabitants of a district, or neighborhood, or persons known or unknown, and the public generally, where it appears, from the subject matter, the sense and connection in which such words are used, that such construction is intended.

As a corporate trustee, BoH is a "person" within the meaning of the HRUS. The KPGC Defendants thus carried their initial burden of showing, and there were no genuine issues of material fact, that BoH was a "person in control of" KPGC. Accordingly, the Circuit Court did not err in concluding that BoH was an "owner" as defined by the HRUS for purposes of applying

14

the statute's immunity provisions.[7/]

### 3. Kukuiolono Management, LLC and Billy Casper Golf, LLC

As previously stated, for purposes of the HRUS, an "owner" includes "[an] occupant, or person in control of the premises."  HRS § 520-2.

In support of their motion for summary judgment, the KPGC Defendants submitted the Declaration of Phil Scot (**Scot**), the Chairman of the Kukuiolono Park Board of Directors, which oversees matters relating to KPGC.  Scot authenticated an attached management agreement and amendments (**Management Agreement**) showing that in 2008, BoH retained BCG to manage KPGC. Scot also authenticated an attached agreement between BCG and its wholly-owned limited liability company KM (**Delegation Agreement**) showing that certain management duties of BCG with respect to the park were delegated to KM, with the consent of BoH.  Pursuant to the Management Agreement, BCG had the "exclusive right and responsibility to operate, manage and maintain the Park."  In accordance with Paragraph 13G of the Management Agreement, BCG delegated certain of its duties and obligations under the Agreement to KM, while reserving BCG's right to exercise at any time any of such duties and obligations.  Further, Scot stated in his declaration that "[KM] has managed the Park from at least 2011 to present[.]"  Similarly, Tom stated in her declaration that "[BoH] . . . exercises (in conjunction with [KM]) control over Kukuiolono Park."

There was no dispute below, and there is none on appeal, that BCG has the power to manage KPGC, and does so in part through KM, which exercises such power pursuant to the Delegation Agreement.  Rather, the Jacobses contend that BCG and KM are not "persons" (see supra) and thus none of them can be a "person in control of the premises."  This argument fails in light of HRS § 1-19, which defines persons to include

---

[7/]    In light of our conclusion, we need not address whether BoH, as a trustee holding trust property for the benefit of the public, is also a "possessor of a fee interest" in KPGC.

corporations, firms, and associations.  See supra.  Limited liability companies such as BCG and KM share sufficient features with these entities to come within the definition of a "person" under the HRUS.  See HRS § 428-111(b) (2004) ("Unless its articles of organization provide otherwise, a limited liability company has the same powers as an individual to do all things necessary or convenient to carry on its business or affairs . . . ."); HRS § 428-201 (2004) ("A limited liability company is a legal entity distinct from its members.")

The Jacobses also argue that "[a] strict construction of the HRUS does not support the broadening of the definition of 'owner' to include . . . property managers and subcontractors who have breached their fiduciary and contractual obligations to keep KPGC in a safe condition."  The Jacobses assert that immunizing the KPGC Defendants, "who have no authority to undo the bequest of the late Walter McBryde to open his land to the public," will not further the legislative intent of the HRUS, but instead, "will create a windfall of blanket immunity that was not intended."

These arguments fail in light of the plain language of the HRUS defining an owner to include an occupant or person in control of the premises.  The KPGC Defendants established, and the Jacobses presented no genuine issue of material fact, that BCG and KM had the power to manage KPGC pursuant to the Management Agreement and the Delegation Agreement.  As such, BCG and KM were occupants or persons in control of the premises (see supra), and thus "owners" as defined by the HRUS.  See supra.

Case law in other jurisdictions with analogous recreational use statutes supports our conclusion.  For example, in Smith v. Sno Eagles Snowmobile Club, Inc., 823 F.2d 1193 (7th Cir. 1987), the Seventh Circuit affirmed the district court's grant of summary judgment in favor of a snowmobile club and a snowmobile trail grooming (i.e., maintenance) organization under Wisconsin's recreational use statute.  The court reasoned:

> We agree with the district court's determination that the term "occupant" in [Wisconsin Statutes] section 29.68 applies to [the snowmobile club and the trail grooming organization] to the extent they constructed and groomed Two

16

> East Trail. If we were to circumscribe and interpret "occupant" as one in actual possession or exclusive control the term would be indistinguishable from owner. This would negate and defeat the very intent of the Wisconsin legislature to open up as much land as possible for recreational use when it enacted section 29.68 and added the recreational activity of snowmobiling in 1970.

Id. at 1198. In concluding that the two organizations constituted "occupants," the court also noted that they "occupied the trail 'with a degree of permanence.'" Id. at 1197.

In Stanton v. Lackawanna Energy, Ltd., the Supreme Court of Pennsylvania affirmed a superior court order directing a trial court to enter summary judgment in favor of a utility easement holder under the state's recreational use statute. 886 A.2d 667, 678 (Pa. 2005). In reaching this conclusion, the supreme court considered whether a utility easement holder was an "occupant" within the meaning of the state's recreational use statute. The court stated:

> The [Recreational Use of Land and Water Act] does not provide specific definitions for the terms "occupant" or "person in control of the premises." However, "occupant" is commonly defined as "one who has possessory rights in, or control over, certain property or premises." *Black's Law Dictionary,* 8th ed. (2004), at 1108. The term "control" is commonly defined as "the power or authority to manage, direct, or oversee[.]"

Id. at 676. The court reasoned: "Based upon these commonly accepted meanings of the relevant terms, [the utility] clearly is an occupant of the property in question, as it regularly maintained the electrical facilities on the property and used a dirt road along its utility line, on the land contained within its easement." Id. "These activities demonstrate that [the utility] has possessory rights in and daily control over its easement." Id. The court explained, "[i]n other words, [the utility] has authority to manage the land and regulate its use." Id.

Similarly, in Robinson v. Illinois Power Co., 789 N.E.2d 792 (Ill. App. Ct. 2003), the court determined that "[o]ne who exercises control over property can be said to occupy it." Id. at 794. The court ruled that the defendant power company constituted an occupant within the meaning of the Snowmobile Registration and Safety Act, where the power company "installed

17

and owned the pole and wires, and maintained them for 55 years." Id.; see also Fagerhus v. Host Marriott Corp., 795 A.2d 221, 231 (Md. Ct. Spec. App. 2002) ("We view this language [defining an 'owner' as 'the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises'] as more clearly encompassing a property manager, in that 'person[s] in control of the premises' undoubtedly describes those with a contractual duty to manage and maintain the premises for the landowner.").

Here, as in Smith, the term "occupant" applies to BCG and KM, to the extent they have managed and maintained KPGC pursuant to the Management Agreement and the Delegation Agreement. Indeed, the KPGC Defendants produced evidence that the two LLCs have been responsible for the day-to-day management of KPGC since 2008, *i.e.*, they have occupied the premises with "a degree of permanence." 823 F.2d at 1197. Additionally, like the "occupants" in Stanton and Robinson, BCG and KM have "exercise[d] control over [the] property" and have had the "authority to manage the land." See Stanton, 886 A.2d at 676; Robinson, 789 N.E.2d at 794.

Our construction of the term "owner" as including property managers such as BCG and KM is also consistent with the history and purpose of the HRUS, because it preserves the incentive for property owners to make land available for recreational use. A contrary construction would undermine that goal.

> If a managing agent is held to be more responsible to a recreational user than a landowner, the end result necessarily will undermine the intent and purpose of the [state recreational use statute]. There can be no doubt that indemnity agreements between the landowner and managing agent either exist or will be created in the future to keep the managing agent free from liability. The net effect is to return liability to the landowner. This in turn will serve only to make private landowners again fear liability and prevent them from permitting or acquiescing in the use of their lands for recreational purposes.

Fagerhus, 795 A.2d at 232.

Construing the term "owner" based on the language of the HRUS, its history, and its purpose, we hold that a property manager such as BCG and KM with a contractual duty to manage and maintain premises that a landowner makes available for

recreational use is an "owner" entitled to invoke the protections of the HRUS. There is no dispute in this case that BCG and KM had the power to manage KPGC under the terms of the Management Agreement and the Delegation Agreement. In these circumstances, the Circuit Court did not err in concluding that BCG and KM were "owners" as defined by the HRUS for purposes of applying the statute's immunity provisions.

### D. Recreational Purpose

The Jacobses contend that "[Jessica's] feeding of chickens or cats was not a recreational activity as contemplated under the HRUS and[,] therefore, immunity from liability does not apply." The KPGC Defendants disagree, arguing that Jessica "indisputably [had] a 'recreational purpose'" on the day of the incident, and the undisputed facts epitomize the type of case that is appropriate for granting summary judgment to a landowner under the HRUS.

The HRUS defines "[r]ecreational purpose" as "includ[ing] but . . . not limited to any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites." HRS § 520-2.

The Jacobses acknowledge that "the activities listed [in the above statutory definition] are not exhaustive," but contend that "their common thread is that the participant derives a certain amount of enjoyment, or health and/or educational benefit from each activity." The Jacobses argue that "[Jessica] was not feeding the chickens and cats for the purposes of her enjoyment or other personal enlightenment" – that she testified in deposition that "she was 'conflicted' by the activity of feeding wild animals[.]" Notably, the Jacobses do <u>not</u> contend that Jessica was at KPGC on the day of the incident for a commercial or work-related purpose. Thus, we must determine whether the activity of feeding or watering wildlife in these circumstances constitutes an unenumerated "recreational purpose" under the HRUS.

19

In two seminal cases, the Hawai‘i Supreme Court has construed the meaning of "recreational user"[8] and "recreational purpose" as used in the HRUS. In Crichfield, the court considered whether HRUS conferred liability protection on a hotel, where one of the plaintiffs was injured while viewing statuary and a fishpond, and both plaintiffs alleged they had entered the hotel grounds with the subjective intent of having lunch at one of the hotel's restaurants. 93 Hawai‘i at 480-82, 6 P.3d at 352-53. Construing the HRUS, the court explained:

> By its plain language, [the] HRUS does not apply if a person is entering or using the land for a non-recreational purpose—*i.e.*, for a commercial purpose, such as purchasing or consuming a meal. [The] HRUS is ambiguous, however, regarding the standpoint or perspective from which a "recreational purpose" is ascertained. Without resort to extrinsic interpretive aids, we are therefore unwilling to hold, as the Ninth Circuit did in Howard[ v. United States, 181 F.3d 1064 (9th Cir. 1999)], that the subjective intent prompting a person to enter or use another's land is immaterial to the question whether HRS § 520-3 relieves a landowner of any duty to the person to keep the premises safe for "entry or use."

Id. at 487, 6 P.3d at 359. The court concluded that "neither the subjective intent of the landowner in holding open the property nor the subjective intent of the entrant in visiting the property w[as] necessarily dispositive as to whether the plaintiff was a recreational user for the purposes of the HRUS." Thompson v. Kyo-Ya Co., 112 Hawai‘i 472, 477, 146 P.3d 1049, 1054 (2006) (citing Crichfield, 93 Hawai‘i at 487-88, 6 P.3d at 359-60). The court further concluded that "the commercial purpose of having lunch at the hotel was a non-recreational use of the property and, in vacating the grant of summary judgment in favor of the hotel, weighed the intent of the landowner and the intent of the entrant and concluded that the plaintiffs' allegations of a commercial purpose with the hotel raised a genuine issue of material fact." Id. (citing Crichfield, 93 Hawai‘i at 487-88, 6 P.3d at 359-60).

---

[8] For purposes of the HRUS, "'[r]ecreational user' means any person who is on or about the premises that the owner of land either directly or indirectly invites or permits, without charge, entry onto the property for recreational purposes." HRS § 520-2.

In Thompson, the supreme court considered "whether [the plaintiff] was on the [defendant hotel's] property as a 'recreational user' for 'recreational purposes' under the HRUS when she was engaged in a traditionally recreational activity but with the subjective intent of doing so for vocational or occupational reasons."[9] Id. at 476, 146 P.3d at 1053 (footnote omitted). The court noted that "[i]n most suits where a HRUS defense has been invoked, the question whether a party is a recreational user has been outcome-dispositive." Id. at 477, 146 P.3d at 1054. After reviewing the legislative history cited in Critchfield, the Thompson court stated:

> This court should, therefore, approach the analysis of whether a HRUS defense is available to the [defendant hotel] in the present matter by seeking an outcome that "encourage[s] the recreational use of our state's resources by limiting landowners' liability to recreational users and, thereby, promot[es] the use and enjoyment of Hawaii's resources" by "encourag[ing] wider access to lands and waters for ... fishing and other activities," while respecting traditional duties owed by landowners to non-recreational entrants.

Id. at 479-80, 146 P.3d at 1056-57. The court concluded that "[the plaintiff's] status on the [defendant hotel's] property fell as a matter of law within the ambit of HRS ch. 520 as a recreational user, inasmuch as she was engaged in 'an activity in pursuit of the use of the property for recreational purposes'" and therefore, "the [defendant hotel] was immunized from her negligence claims under the HRUS." Id. at 481, 146 P.3d at 1058. The court further ruled that the circuit court had correctly entered summary judgment in favor of the defendant hotel, and noted that "unlike Crichfield, there is no danger in the present matter that this ruling will allow owners to exploit the HRUS to avoid liability for activities related to them or from which they benefit." Id. at 481-82, 146 P.3d at 1058-59.

In Thompson, the supreme court also relied in part on Palmer v. United States, 945 F.2d 1134 (9th Cir. 1991), in which the Ninth Circuit construed the term "recreational purpose" as

_____

[9] The plaintiff, a certified scuba instructor, was injured on the hotel's "unlit beach-access path" when exiting the water and returning to her vehicle. Thompson, 112 Hawai'i at 473, 146 P.3d at 1050.

21

set out in the HRUS.  In Palmer, the court affirmed a district court decision that the HRUS immunized a federal military recreational facility from negligence claims asserted by the plaintiff grandfather who slipped and fell at a swimming pool while watching over his granddaughters.  Id. at 1135.  The plaintiff argued that the HRUS did not apply because "he was engaged in the non-recreational activity of supervising his grandchildren and was not permitted to use the swimming pool."  Id. at 1136.  Rejecting this argument, the court reasoned:

> Even assuming that watching over one's own grandchildren is not a recreational activity, [the plaintiff's] services conferred no benefit upon the [recreational facility].  He was not there for the [facility's] purposes, but rather to facilitate his grandchildren's authorized use of the pool. . . .  He was allowed on the property for his granddaughters' recreational purposes, which is the type of permissive use the HRUS seeks to encourage.
>
> Moreover, [the plaintiff's] behavior was consistent with relaxation and recreation.  He was lounging in the sun.  We therefore conclude that he was engaged in a recreational activity for purposes of the HRUS.  By affording immunity in this situation, the purpose of the HRUS to encourage landowners to make their recreational property available for use is served.

Id. at 1136-37 (citations omitted).

Here, unlike the plaintiffs in Critchfield and Thompson, the Jacobses do not assert that Jessica was at KPGC on the day of the incident for a commercial or work-related purpose.  Rather, there is no genuine issue of material fact that Jessica visited KPGC that day for the purpose of feeding or watering wildlife.  The Jacobses argue that this was not a recreational purpose under the HRUS because Jessica was "conflicted" about, and thus did not derive enjoyment or enlightenment from, this activity.  However, this "enjoyment" standard finds no support in the statutory text of the HRUS or the case law that has construed it.  Indeed, the Jacobses' asserted standard would conflict with the plain language of HRS § 520-2 and its enumerated recreational purposes, where, for example, the entrant visiting property that is held open for a recreational purpose such as swimming or boating does not enjoy the activity because the water is rough or the person is injured, i.e., the very circumstance that may trigger the liability protections of the HRUS.  This position

22

would encourage land closures, contrary to the legislature's intent to encourage landowners to allow entry to individuals wishing to "use . . . the owner's land for recreational purposes—i.e., the recreational enjoyment of the natural resources that are an inextricable part of Hawaii's land and waters." Crichfield, 93 Hawaiʻi at 489, 6 P.3d at 361 (internal quotation marks omitted).  Moreover, while Jessica testified that she was "conflicted" about feeding wildlife, there is no dispute that, like the plaintiff in Palmer, she "conferred no benefit" on KPGC and that feeding wildlife is "consistent with," 945 F.2d at 1136-37, recreational purposes such as "nature study" or "viewing . . . scenic . . . sights."  HRS § 520-2.  If hunting and fishing are recreational purposes under the HRUS, then surely caring for wildlife can also be such a purpose in these circumstances.[10] See Thompson, 112 Hawaiʻi at 487, 146 P.3d at 1064 (Acoba, J. concurring) ("Because the [HRUS] enumerates activities within the scope of the general reference to 'recreational purpose,' it is easily discerned that scuba diving is similar in nature to such water sports as swimming, fishing or boating.  The 'term "includes" is ordinarily a term of enlargement, not of limitation; a statutory definition of [a] thing as "including" certain things does not necessarily impose a meaning limited to inclusion.'" (quoting Schwab v. Ariyoshi, 58 Haw. 25, 35, 564 P.2d 135, 141 (1977))).

We therefore hold that the Circuit Court correctly concluded there was no genuine issue of material fact that on the day of the incident, Jessica was on the KPGC premises for a recreational purpose.

**E.    "Wilful or Malicious" Failure to Guard Against or Warn**

Pursuant to HRS § 520-5(1), an "owner" is not immune from tort liability, if the injury results from the owner's "wilful or malicious failure to guard or warn against" either "a dangerous condition, use, or structure which the owner knowingly

---

[10]    Jessica also testified and there is no dispute that she intended to take a photograph while at KPGC on the day of the incident, another activity that is consistent with recreational purposes such as "nature study" or "viewing . . . scenic . . . sights."  HRS § 520-2.

creates or perpetuates," or "a dangerous activity that the owner knowingly pursues or perpetuates." See Crichfield, 93 Hawaiʻi at 485, 6 P.3d at 357 (quoting HRS § 520-5 (1993)).

The Jacobses make a two-fold argument based on this provision of the HRUS. First, they contend that "[w]hether [the KPGC Defendants'] conduct was wilful or malicious under the HRUS is clearly a question of fact for the jury and[,] therefore, precludes summary judgment." Second, the Jacobses argue that "[e]ven if the issue of whether [the KPGC Defendants'] conduct was wilful or malicious was subject to summary judgment adjudication, there exist genuine issues of material fact regarding whether [the KPGC Defendants'] conduct was wilful or malicious under the HRUS's exception to immunity[.]"

We address each of these arguments in turn, below.

### 1.    Summary Judgment Not Precluded

Contrary to the Jacobses's first argument, whether an owner's failure to act is wilful or malicious under the HRUS is not *always* an issue of fact for the jury that precludes summary judgment. If the movant owner asserts that it did not act wilfully or maliciously in failing to guard against or warn in the circumstances identified in HRS § 520-5, and satisfies its initial burden of producing evidentiary support for its assertion, then "the party opposing summary judgment must 'demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.'" Nozawa, 142 Hawaiʻi at 342, 418 P.3d at 1198 (quoting Lales, 133 Hawaiʻi at 359, 328 P.3d at 368). If the non-moving party fails to do so, the issue can be determined by summary judgment.

Indeed, the supreme court has affirmed summary judgment in favor of defendants in other contexts involving the defendants' alleged wilful or malicious conduct. See, e.g., Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of Directors v. Venture 15, Inc., 115 Hawaiʻi 232, 298, 167 P.3d 225, 291 (2007) ("Inasmuch as the AOAO has not shown 'a positive element of conscious wrongdoing' in order to justify an award of punitive damages against Royal, Lee, and Liu, we hold that the

circuit court did not err in granting summary judgment in favor of Royal, Lee, and Liu on the AOAO's claims for punitive damages." (citation omitted)); Arquette v. State, 128 Hawaiʻi 423, 437, 290 P.3d 493, 507 (2012) (in the malicious prosecution context, "[b]are allegations or factually unsupported conclusions are insufficient to raise a genuine issue of material fact, and therefore, insufficient to reverse a grant of summary judgment") (quoting Wong v. Cayetano, 111 Hawaiʻi 462, 483, 143 P.3d 1, 22 (2006)) (internal quotation marks omitted)).

### 2.    Issues of Fact in this Case

The Jacobses also contend that the Circuit Court erred in granting summary judgment in favor of the KPGC Defendants because there was a genuine issue of material fact as to whether the Jacobses' injuries resulted from the KPGC Defendants' wilful or malicious failure to guard or warn against a dangerous condition that they knowingly created or perpetuated, i.e., vine-laden trees and branches abutting the golf course and park that were prone to breakage in high winds, leading to the failure of even large branches.

The KPGC Defendants argue in response that under prevailing case law, "if someone is injured by a 'natural condition[,]' then the landowner cannot be deemed to be 'willful or malicious[.]'" (Emphasis omitted.) At least two federal courts construing the HRUS have concluded that even a wilful or malicious failure to guard or warn against a dangerous natural condition – i.e., dangerous ocean surf – is not actionable under HRS § 520-5 because a natural danger is not one that the landowner "knowingly creates or perpetuates." See Covington v. United States (Covington II), 916 F. Supp. 1511, 1522 (D. Haw. 1996), aff'd, Nos. 96-15205, CV-94-00330-ACK, 1997 WL 408040 (9th Cir. July 17, 1997); Viess v. Sea Enters. Corp., 634 F. Supp. 226, 231 (D. Haw. 1986). Relying on Covington II and Viess, the KPGC Defendants argue that "[t]he trees, branches, and wind were obviously natural conditions" and the "natural forest area of Kukuiolono Park is very similar to the natural ocean[.]" (Emphases omitted.)

Here, however, the evidence submitted by the Jacobses indicated that the tree branch that fell on Jessica was not in the middle of the forest, but near the edge of a parking lot, and unlike ocean surf, dangerous trees or limbs that border public spaces and access ways can be pruned. In opposing the summary judgment motion, the Jacobses submitted the declaration of a certified arborist, Jim Campbell (**Campbell**), who inspected the area where the branch failed and injured Jessica, as well as the portion of the tree branch that remained. According to Campbell, the branch that failed originated from a tree that was lying on the ground, "just inside the tree/vegetation line fronting an area commonly used by the public for parking, relaxing and feeding wild chickens etc. . . . The branch was overgrown with vines that add extra weight and act as a sail to catch wind." Campbell opined:

> Trees bordering parking areas used by the public require periodic inspections and maintenance as needed to mitigate hazardous conditions that may pose a high risk compromising safety.
>
> . . . [T]he branch that failed should have been pruned to reduce over all length thus reducing weight stress, providing a margin of safety for the public in the nearby area.

In addition, photographs of the branch that purportedly fell on Jessica appear to show the branch covered in vines.

On this record, we cannot conclude as a matter of law that the KPGC Defendants could not at least have perpetuated the allegedly dangerous condition at issue in this case, *i.e.*, vine-covered trees and branches that were prone to break in high winds, and which bordered a public parking lot and access area of KPGC. Rather, the KPGC Defendants may be held liable to the extent that they knowingly created or perpetuated, and wilfully or maliciously failed to guard or warn against, this alleged danger. The HRUS permits such liability because it is not based merely on negligence. See Covington v. United States, 902 F. Supp. 1207, 1213 (D. Haw. 1995).

The HRUS does not define the terms "wilful" or "malicious," and the Hawaiʻi Supreme Court has not construed these terms in the context of the HRUS. Black's Law Dictionary

26

defines "willful" in relevant part as follows:

> Voluntary and intentional, but not necessarily malicious. A voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong.

Black's Law Dictionary 1916 (11th ed. 2019); see State v. Villiarimo, 132 Hawaiʻi 209, 222 n.17, 320 P.3d 874, 887 n.17 (2014) (citing Black's definition of "willful" in interpreting HRS § 706-625(3)); Iddings, 82 Hawaiʻi at 7, 919 P.2d at 269 (interpreting the "wilful and wanton" misconduct exception to co-employee immunity under HRS § 386-8: "'Willful' is defined in pertinent part as '[p]remeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification'") (citing Black's Law Dictionary 1599 (6th ed. 1990) (emphasis omitted)).

"Malicious" is defined as: "1. Substantially certain to cause injury[;] 2. [w]ithout just cause or excuse." Black's Law Dictionary 1146 (11th ed. 2019); see Awakuni v. Awana, 115 Hawaiʻi 126, 141, 165 P.3d 1027, 1042 (2007) (citing Black's definition of "malicious" in interpreting HRS § 26-35.5(b)). "Malice" is defined as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "[r]eckless disregard of the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart."[11] Black's Law Dictionary 1145-46 (11th ed. 2019); see Awakuni, 115 Hawaiʻi at 141, 165 P.3d at 1042 (citing Black's definition of "malice").

With these definitions in mind, we turn to the evidence that was submitted as to whether the KPGC Defendants wilfully or maliciously failed to guard or warn against the condition at issue. The KPGC Defendants produced evidence that the KPGC trust spends approximately $400,000 per year on employees' salaries and wages, including "substantial amounts . . . on landscaping,

---

[11] Similarly, a "malicious injury" is defined as "[a]n injury resulting from a willful act committed with knowledge that it is likely to injure another or with reckless disregard of the consequences." Black's Law Dictionary 939 (11th ed. 2019).

maintenance, and club house staff[.]"  In addition, Scot stated in his declaration that "from 1982 to present, the Park has continuously employed a general manager and numerous landscapers and maintenance workers to take care of the Park, including the golfing[.]"  Scot further stated that from 1982 to the present: (1) "if there were any accidents at the Park where someone was injured, as the Chairman of the Board, I was informed of that accident by the general manager[,]" and (2) "there was never a report to me of any other accidents or incidents at the Park in which a tree or tree branch struck or hit anyone."

The Jacobses, however, contend that other evidence creates a genuine issue of material fact as to whether the KPGC Defendants' alleged failure to guard or warn was wilful or malicious.  In addition to the Campbell declaration (see supra), the Jacobses submitted the deposition testimony of Cedric DeFabian (**DeFabian**), a groundskeeper at KPGC.  DeFabian testified that prior to Jessica's injury, he had to move or trim tree limbs that broke due to high winds three to four times a year; some had "a lot of vines on them[.]"

The Jacobses also submitted the deposition testimony of Patrick Hunt (**Hunt**), the former general manager of KPGC who retired in 2015.  Hunt testified in part as follows:

> Q. Do you have any guidelines for when to trim certain trees or branches?
>
> A. We trim our coconut trees when they get coconuts on 'em so no one would get hit in the head with a coconut.
>
> Q. What about for the trees that are bordering the grass areas and the parking lots?
>
> A. . . . . If it encroached, a danger to cars or people walking, then we'd cut 'em back.
>
> Q. So only if they're encroaching?
>
> A. Right.
>
> Q. Then you would trim?
>
> A. Yeah.

Hunt stated that during his eight years at KPGC, he recalled four to five trees that had fallen, one due to wind and others because they were old.  Hunt also testified that the wind was "very, very

28

strong" on the day that the branch fell on Jessica.

Viewed in the light most favorable to the Jacobses, as the non-moving parties, the evidence they submitted raises a factual issue as to whether the KPGC Defendants knew of the alleged dangerous condition, *i.e.*, vine-covered trees and branches that were prone to break in high winds, and which bordered a public parking lot and access area of KPGC. See Nozawa, 142 Hawaiʻi at 342, 418 P.3d at 1198. In particular, DeFabian testified that he had to move or trim tree limbs, some with "a lot of vines on them," that broke due to high winds three to four times a year. Hunt testified that he recalled four to five trees that had fallen during his tenure at KPGC, at least one due to wind. The evidence also raises a factual issue as to whether the KPGC Defendants knew that visitors to the park were likely to be injured by objects, such as branches, falling from trees bordering public spaces. Hunt testified, for example, that "[w]e trim our coconut trees . . . so no one would get hit in the head with a coconut." In their answering brief, the KPGC Defendants assert: "Everyone, including [Jessica], knows that branches of trees can blow down in high winds. She should have been more vigilant." (Emphasis omitted.) Yet, with knowledge of this danger, at least according to Hunt, KPGC managers allegedly took no action to trim vine-covered trees bordering the grass areas and parking lots or to warn visitors of the danger of falling branches on windy days. Thus, the evidence submitted by the Jacobses, when viewed in the light most favorable to them, raises a factual issue as to whether the KPGC Defendants consciously failed to act to avoid a recognized danger that they knowingly perpetuated. See id. at 342, 418 P.3d at 1198.

In light of this evidence, we conclude there is a genuine issue of material fact as to whether the KPGC Defendants knowingly perpetuated, and wilfully or maliciously failed to guard or warn against, the alleged danger posed by vine-covered trees and branches that were prone to break in high winds, and which bordered a public parking lot and access area of KPGC. We note, however, that the Jacobses must ultimately prove that the KPGC Defendants knowingly created or perpetuated this alleged

danger, and that their alleged failure to act to avoid the danger was wilful or malicious.  To establish liability, the Jacobses must also prove that the alleged failure to guard or warn against the danger actually caused the Jacobses' harm.

### IV. Conclusion

For the reasons discussed above, we vacate the Final Judgment, entered on November 29, 2016, by the Circuit Court of the Fifth Circuit.  We remand the case to the Circuit Court for further proceedings consistent with this opinion.

On the briefs:                          /s/ Lisa M. Ginoza
                                        Chief Judge
Sue V. Hansen
for Plaintiffs-Appellants               /s/ Clyde J. Wadsworth
                                        Associate Judge

Chad P. Love,                           /s/ Karen T. Nakasone
Barbara Kirschenbaum, and               Associate Judge
Chuck T. Narikiyo
(Love & Kirschenbaum)
for Defendants-Appellees